**UNITED STATES of America, Plaintiff,**

v.

**Harold "Skip" FINN, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**Alfred "Tig" PEMBERTON, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**Daniel BROWN, Defendant.**

**Crim. Nos. 5–95–12(01) to 5–95–12(03).**

United States District Court,
D. Minnesota,
Fifth Division.

Oct. 12, 1995.

Douglas A. Kelley, Kelley Law Office, Minneapolis, MN, for Harold "Skip" Finn.

Bruce Henry Hanley, Hanley & Dejoras, Minneapolis, MN, for Alfred "Tig" Pemberton.

Kevin J. Short, Short Law Office, Minneapolis, MN, for Daniel Brown.

Paul Anthony Murphy, Michael W. Ward, U.S. Atty. Office, Minneapolis, MN, for U.S.

## ORDER AND REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

 This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A) and (B), upon the following pretrial Motions of the Defendants: [1]

1. The Motion of the Defendants Harold "Skip" Finn ("Finn") and Daniel Brown ("Brown") that the government agents retain their rough notes; [2]

2. The Motion of Finn and Brown to compel the production of Sentencing Guidelines information;

3. The Motion of Finn and Brown for the disclosure of Jencks Act materials; [3]

4. The Motion of Finn and Brown for the disclosure of Rule 404(b) evidence; [4]

5. The Motion of Finn and Brown for discovery and inspection, and the Motion of the Defendant Alfred "Tig" Pemberton

1. The Government has moved for discovery against each of the Defendants and, that Motion having been unopposed, it is granted without further discussion.

2. The Government has represented that the case agent assigned to this matter has been directed to retain his rough notes for disclosure to the Defendants. Therefore, this Motion will be granted.

3. The established rule in this Circuit is that, ordinarily, the Government is not required to disclose Jencks Act material prior to the direct examination of the witness to whom the material pertains. See, *United States v. Douglas,* 964 F.2d 738, 741 (8th Cir.1992); *United States v. White,* 750 F.2d 726, 729 (8th Cir.1984). Here, however, the Government has volunteered to produce all Jencks Act material by no later than seven days prior to the commencement of trial. Accordingly, the Motion will be granted, subject to the noted seven-day time constraint.

4. The Government has agreed to produce, at least seven days prior to trial, any evidence contemplated by Rule 404(b), Federal Rules of Evidence. Accordingly, the Motion will be granted, subject to the noted seven-day time constraint. However, in light of Finn's request for all "bad acts" or "similar course of conduct" evidence, the Government has requested that we delineate what evidence it is required to disclose under Rule 404(b). Since we have not been apprised of the nature of the evidence available to the Government, we may now provide only the most generalized of advices on the subject.

Rule 404(b) permits the admission of evidence concerning a Defendant's "other crimes, wrongs, or acts" only for limited purposes and, if the Defendant so requests, only after reasonable notice of the general nature of the evidence that the Government intends to use. *United States v. Escobar,* 50 F.3d 1414, 1421 (8th Cir.1995). Under the established law of this Circuit:

> Evidence which is probative of the crime charged * * * is not 'other crimes' evidence.

("Pemberton") and Brown for the disclosure of government witnesses;[5]

6. The Motion of Finn and Brown for the disclosure of evidence favorable to the respective Defendant;[6]

7. The Motion of Finn for the disclosure of post-conspiracy statements of co-Defendants;

8. The Defendants' Motion for a Bill of Particulars;

9. The Motion of Finn and Brown to compel the immediate disclosure of expert witness summaries;[7]

10. The Motion of Finn and Brown for the disclosure of Grand Jury instructions,

"Further, where the evidence of an act and the evidence of the crime charged are inextricably intertwined, the act is not extrinsic and Rule 404(b) is not implicated." *United States v. Oakie*, 12 F.3d 1436, 1441–42 (8th Cir.1993) quoting *United States v. DeLuna*, 763 F.2d 897, 913 (8th Cir.1985), cert. denied, 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985).

As noted, at this stage of the proceedings, we can only provide generalized guidance as to the evidence that the Government must disclose under Rule 404(b). Of course, "Rule 404(b) is an inclusionary rule: other crimes evidence is admissible unless it is only offered to show the defendant's criminal propensities." *United States v. Escobar*, supra at 1421. To the extent that the Defendants believe that the Government has introduced "bad acts" evidence which it failed to disclose prior to trial, the claim may be addressed as an objection at trial.

5. The Government has agreed to produce, by the first week in December, all of the materials that it is required to disclose under Rule 16(a)(1)(A) through (E), Federal Rules of Criminal Procedure. As is our practice, at the Hearing in this matter, we informed the parties that any discovery, which exceeds these basic parameters, should be convincingly supported by factual or legal exigencies. None have been provided. As a consequence, the discovery Motion of Finn and Brown is granted, consistent with the scope of discovery allowed by Rule 16, and subject to the Government's production of such evidence by December 1, 1995.

With respect to the Motions of Pemberton and Brown for a listing of the Government's witnesses, under the prevailing law of this Circuit, there is no obligation for the Government to disclose its witness list during pretrial discovery. *Arcoren v. United States*, 929 F.2d 1235, 1242 (8th Cir.1991), cert. denied, 502 U.S. 913, 112 S.Ct. 312, 116 L.Ed.2d 255 (1991); *United States v. Porter*, 850 F.2d 464, 465 (8th Cir.1988); *United States v. McMahan*, 744 F.2d 647, 651 (8th Cir.1984) (*Brady* "does not require the Government to provide defendants with all information

minutes and transcript, or for an *in camera* review of the same;

11. The Defendants' Motion to dismiss and/or strike all references to actions to defraud the State of Minnesota of sales tax;

12. The Motion of the Defendants Pemberton and Brown for severance and for separate trials;

13. The Motion of Pemberton to bifurcate the forfeiture proceedings;[8]

14. The Motion of Pemberton for leave to issue Rule 17(c) subpoenas without a particularized showing to the Court;

it has regarding each of its witnesses"). Thus, the Motion will be denied. We do note that, as a result of the Government's agreement to provide any pertinent Jencks Act materials no later than seven days prior to Trial, the Defendants will have actual notice of the more pivotal witnesses that the Government intends to call during its case-in-chief.

6. The Government has acknowledged its obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, and has advised that this information either has been, or will be, produced to the Defendants. Therefore, the Motion of the Defendants is granted.

7. The Government has acknowledged its obligations under Rule 16(a)(1)(E), and has advised that the relevant information will be produced to the Defendants. At the Hearing, the Defendants requested that these disclosures occur at least 45 days prior to Trial. While we have found no basis to compel expert disclosures at such an early date, we note the guidance provided by the Advisory Committee which urges a timely disclosure of expert opinion evidence. See, *Advisory Committee Notes to Rule 16*, 1993 Amendment ("although no specific timing requirements are included, it is expected that the parties will make their requests and disclosures in a timely fashion"). Accordingly, we direct that the Government disclose, as the expert opinions become available, the summaries for those experts which the Government expects to proffer at Trial, with the disclosures occurring no later than seven days before the trial commences. Therefore, the Motion of the Defendants will be granted, subject to the seven-day time constraint.

8. The Government does not object to a bifurcated proceeding in which the Jury will first determine guilt, and then hear additional evidence on the propriety of a forfeiture. Accordingly, Pemberton's Motion to bifurcate the forfeiture proceedings is granted.

15. The Motion of Brown to affirm or deny the Government's use of electronic surveillance; [9]

16. The Defendants' Motion for the suppression of physical evidence and statements;

17. The Defendants' Motion to dismiss the indictment for want of subject matter jurisdiction;

18. The Motion of Finn and Pemberton to dismiss Counts 2 through 9 and 26;

19. The Motion of Finn and Pemberton to dismiss Counts 10, 11, 13 and 14;

20. The Motion of Finn and Pemberton to dismiss Count 12;

21. The Motion of Finn to dismiss Counts 15 through 19; and the Motion of Pemberton to dismiss Count 19; and

22. The Motion of Finn and Brown to dismiss Counts 21 and 22, and the Motion of Pemberton to dismiss Counts 20 through 22.[10]

A Hearing on the Motions was conducted on August 30, 1995, at which time Finn appeared by Douglas A. Kelley and Steven E. Wolter, Esqs.; Pemberton appeared by Bruce H. Hanley, Esq.; Brown appeared by Kevin J. Short, Esq.; and the Government appeared by Paul A. Murphy and Michael W. Ward, Assistant United States Attorneys.

As to the Motions which remained for resolution at the close of the Hearing in this matter, we either deny the Motions or we recommend that they be denied.

## II. *Findings of Fact*

By a 26–Count Indictment that was filed on June 7, 1995, the Defendants are charged with participating in a conspiracy to steal and misapply money, including Federal funds, belonging to the Leech Lake Band of the Minnesota Chippewa Indians ("Leech Lake Band"), in violation of Title 18 U.S.C. § 371.[11]

9. By this Motion, Brown requests an affirmance or denial by the Government, which would advise whether any of the agencies of the United States have participated in unauthorized wiretapping, eavesdropping, or seizures pursuant to Title 18 U.S.C. § 3504. The Government has represented that it did not conduct electronic surveillance in this case and, therefore, Brown's Motion is denied as moot.

10. In addition, the parties each moved for leave to join in the non-duplicative Motions of a co-Defendant. For reasons addressed at the time of the Hearing, such a practice unfairly delegates to the Court a Defendant's proper function of determining what Motions are germane to his own defenses. As to those Motions which merely reaffirm the Government's obligations under statutory or decisional law, and as to those which seek a dismissal on legal bases, such a Motion to Join is largely superfluous. Nevertheless, in the interests of justice, we granted the Defendants leave to advise the Court, by a brief written submission, of those Motions of a co-Defendant which the submitting Defendant wished to join. Such written advices have now been lodged with the Court, and the Motions have been amended accordingly.

Several other Motions were, more properly, Motions *in limine* which we defer to the Trial Court for a ruling. Specifically, we have in mind Pemberton's Motions for a continuance of the Trial, for the transfer of the Trial to St. Paul, for leave to submit a Jury questionnaire, for additional preemptory challenges, and for an individualized, sequestered voir dire. To the extent that the District Court has not presently ruled upon these Motions, we defer to its ruling as they become ripe for an adjudication.

Lastly, we grant the Defendants' Motion for leave to file additional Motions, should circumstances so warrant. See, *Rule 12(f), Federal Rules of Criminal Procedure*.

11. Rule 12(e), Federal Rules of Criminal Procedure, provides that, "[w]here factual issues are involved in determining a motion, the court shall state its essential factual findings on the record." Except as supplemented by the Court's recitation of factual findings in the portion of this Opinion that addresses the Defendants' Motions to Suppress evidence, the essential factual findings that are required by the Recommendations of this Court, are contained in this segment of the Court's Opinion.

Necessarily, in drawing these factual findings, we have relied heavily upon the well-pleaded allegations of the Indictment which, for purposes of the Defendants' Motions to Dismiss, are taken as true. See, *United States v. Andreas*, 374 F.Supp. 402, 406 (D.Minn.1974); *United States v. J.R. Watkins Company*, 16 F.R.D. 229, 234 (D.Minn.1954); see also, *United States v. Sampson*, 371 U.S. 75, 78–79, 83 S.Ct. 173, 174–75, 9 L.Ed.2d 136 (1962); *United States v. Luros*, 243 F.Supp. 160, 165 (N.D.Iowa 1965), cert. denied, 382 U.S. 956, 86 S.Ct. 433, 15 L.Ed.2d 361 (1965). Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require. *United States v. Moore*, 936 F.2d 287, 288–89 (6th Cir. 1991), cert. denied, 505 U.S. 1228, 112 S.Ct. 3052, 120 L.Ed.2d 918 (1992); *United States v. Prieto–Villa*, 910 F.2d 601, 610 (9th Cir.1990).

The Defendants are further accused of using the mails, and Finn and Pemberton are each accused of having engaged in money laundering, in furtherance of that conspiracy. Moreover, all of the Defendants are accused of impeding an investigation that was then being conducted by the United States Department of the Interior.

Accordingly, in addition to one Count of conspiracy, Finn has been charged with three Counts of mail fraud, in violation of Title 18 U.S.C. §§ 1341, 1346 and 2; with nine Counts of embezzlement and theft from an Indian Tribal Organization ("ITO"), in violation of Title 18 U.S.C. § 1163; with four Counts of theft from a program that has received Federal funds, in violation of Title 18 U.S.C. § 666; with one Count of bribery involving a program that has obtained Federal funds, in violation of Title 18 U.S.C. §§ 666 and 2; with five Counts of money laundering, in violation of Title 18 U.S.C. § 1957; and with one Count of obstructing the due administration of justice by a Federal Grand Jury, in violation of Title 18 U.S.C. § 1503.

Along with one Count of conspiracy, Pemberton has been charged with three Counts of mail fraud, in violation of Title 18 U.S.C. §§ 1341, 1346, and 2; with one Count of embezzlement and theft from an ITO, in violation of Title 18 U.S.C. § 1163; with one Count of theft from a program that has received Federal funds, in violation of Title 18 U.S.C. § 666; with one Count of bribery involving a program that has obtained Federal funds, in violation of Title 18 U.S.C. §§ 666 and 2; with one Count of money laundering, in violation of Title 18 U.S.C. § 1957; and with one Count of knowingly and willfully making a false statement, in violation of Title 18 U.S.C. § 1001.

Brown, in addition to the conspiracy Count, has been charged with three Counts of mail fraud, in violation of Title 18 U.S.C. §§ 1341, 1346, and 2; and with one Count of knowingly and willfully making a false statement, in violation of Title 18 U.S.C. § 1001. In addition, the Indictment includes forfeiture allegations against Finn and Pemberton, pursuant to Title 18 U.S.C. § 982(a) and Title 21 U.S.C. § 853(p). The events which precipitated these charges, and which are germane to the Motions before the Court, may be briefly summarized.

Due to an increase in insurance premiums, the Leech Lake Band initiated a self-insurance program in August of 1985. On October 1, 1985, the Leech Lake Reservation Business Committee ("RBC")[12] created a self-insurance plan, the purpose of which was to establish accounts for the collection of tribal funds to be used in the payment of liability claims. Pursuant to this plan, the RBC, through the passage of a tribal resolution, established Reservation Risk Management, Inc., ("RRM—Tribal Corp.")[13] to manage the self-insurance plan.[14] Finn encouraged the creation of RRM—Tribal Corp., and Pemberton and Brown voted for the tribal resolution by which that corporation was created.

In October of 1985, RRM—Tribal Corp. issued a ten-year insurance policy to the RBC. Finn signed his name on the policy, and also signed the initials "/kb," as RRM—Tribal Corp.'s authorized representative.[15]

---

**12.** The RBC was comprised of five persons who were elected by the membership of the Leech Lake Band. The RBC is now referred to as the Tribal Council.

During the relevant time period, the relationships between the Defendants and RBC were as follows: 1) Finn was the attorney for the Leech Lake Band from 1983 to June 1, 1990; 2) Pemberton was the Secretary–Treasurer of the RBC from 1976 to June of 1990, and he was the Chairperson from 1992 through the time of his Indictment; and, 3) Brown was a member of the RBC from 1985 to June of 1988; he was the Chairperson of the RBC from July of 1988 to 1992; and he held the position of Secretary–Treasurer of the RBC from June of 1994 through the time of his Indictment.

**13.** The October 1, 1985, tribal resolution stated that RRM—Tribal Corp. "shall be considered a corporate sub-entity of the Leech Lake Reservation Business Committee."

**14.** In pertinent part, the Corporate Charter and the Articles of Incorporation for RRM—Tribal Corp. memorialized that "the Leech Lake Reservation Business Committee does hereby charter a subordinate body politic to manage the Leech Lake Reservation's Self Insurance Plan."

**15.** The policy purported to provide the RBC with the following coverages:

As legal counsel for the Leech Lake Band, Finn explained the insurance policies to the RBC on October 29, 1985 and, shortly thereafter, as an agent of RRM—Tribal Corp., Finn issued an insurance binder. The binder represented the insurance coverage that was protecting the RBC in the event of a loss. The Government contends, however, that the Defendants knew that they did not have sufficient means, either in RRM—Tribal Corp. or in any other corporate enterprise, to provide the liability protection that they had promised to underwrite.

On January 14, 1986, the RBC obligated itself to make payments to RRM—Tribal Corp., in exchange for insurance coverage.[16] Finn, acting as its President, executed the Agreement on behalf of RRM—Tribal Corp., while Pemberton, as Secretary–Treasurer, and Hartley White ("White"), as the Committee's Chairperson, approved the Agreement on behalf of the RBC.[17]

On November 5, 1985, Finn, along with Pemberton and White, who was still acting as the Chairperson of the RBC, executed a "Pre–Organization Subscription Agreement of Reservation Risk Management, Inc." White, on behalf of the RBC, subscribed to the purchase of 250 shares in RRM—Tribal Corp. for $62,500, and Finn subscribed to the purchase of 750 shares in RRM—Tribal Corp. for $187,500. Finn never paid the amount agreed upon and, more importantly, RRM—Tribal Corp. never issued any shares.

On January 14, 1986, Finn and Pemberton issued stock certificate number 001, in the name of the RBC, for 250 shares, and stock certificate number 002, in the name of Harold Finn, for 750 shares. In contrast to the subscription Agreement, the shares were not issued as the stock of RRM—Tribal Corp., however, but were shares of Reservation Risk Management, Inc., which was a corporation organized under the laws of the State of Minnesota ("RRM—Minnesota Corp."). Nevertheless, RRM—Minnesota Corp. was not formed until March 18, 1986. According to the Indictment, RRM—Minnesota Corp. was created as a shell corporation in furtherance of the Defendants' conspiracy.

On that same day—January 14, 1986—Finn, Pemberton and White executed a "Shareholder's Agreement" between the RBC and RRM—Tribal Corp. Amongst its other provisions, the Agreement "required that the RBC make payments to RRM, Inc. in exchange for the insurance coverage * * *, which coverage the defendants then knew did not exist." In addition, the Agreement provided, in part, that the "reserves in Fund C shall belong to the shareholders of RRM and cannot be distributed unless the parties (RBC and Finn) mutually agree to modification of this Agreement or dissolution of RRM."[18] As noted, no stock in RRM—

| | | | | |
|----|-----------------------------------|----|---------|---------------------|
| a. | Buildings and Contents | $ | 7,961,880 | |
| b. | Personal Property | $ | 695,647 | |
| c. | Owner's Landlords | $ | 50,000 | per person |
| | | $ | 500,000 | aggregate annually |
| d. | Deductible | $ | 10,000 | buildings |
| | | $ | 5,000 | personal property |
| e. | Comprehensive General Liability | $ | 50,000 | per person |
| | | $ | 300,000 | aggregate |
| f. | Premises Medical Payments | $ | 500 | per person |
| | | $ | 5,000 | per accident |

**16.** The Defendants had previously submitted the following premium schedule:

 a. October 1, 1985—September 30, 1986: $300,000.
 b. October 1, 1986—September 30, 1990: $400,000 (annually).
 c. October 1, 1990—September 30, 1995: $450,000 (annually).

**17.** Pursuant to the October 1, 1985 tribal resolution, the Chairperson and Secretary–Treasurer of the RBC were authorized to execute any documents necessary to effectuate the self-insurance plan.

**18.** As its Chairperson, White executed the Agreement on behalf of the RBC. Pemberton and Finn each signed the Agreement while serving in dual capacities. At that time, Pemberton served as Secretary of RRM—Tribal Corp., a position to which he had not been elected, and as Secretary–Treasurer of the RBC. Like Pemberton, Finn

Tribal Corp. was ever issued. Although White, on behalf of the RBC, and Finn, personally, subscribed to the purchase of shares in RRM—Tribal Corp., RBC and Finn were issued shares in RRM—Minnesota Corp.

On January 15, 1987, Finn drafted, on RBC stationery, a letter by which Pemberton and Brown were appointed to serve on the Board of Directors for RRM—Tribal Corp. The first meeting of the incorporators was held at Walker, Minnesota, on February 4, 1987, at which time the Defendants elected themselves, along with Sally Pemberton and Teri Finn, to the Board of Directors of RRM—Tribal Corp. In addition, the Board adopted the "By–Laws of the Reservation Risk Management, Inc., a corporation of the Leech Lake Band of Chippewa Indians," and Finn was elected President, Pemberton was elected Secretary–Treasurer, and Brown was elected Vice–President of the corporation. On February 10 and 20, 1987, Finn obtained, by proxy, Teri Finn's and Sally Pemberton's votes as members of RRM—Tribal Corp.'s Board of Directors. Thereafter, Finn controlled three of the five votes held by RRM—Tribal Corp.'s Board.

On March 13, 1987, Finn and Pemberton issued stock certificate 003 for 630 shares of RRM—Minnesota Corp. to Finn,[19] certificate 004 for 72 shares to Pemberton, and certificate 005 for 48 shares to Brown.[20] On April 9, 1987, the Board of Directors of RRM—Tribal Corp. approved the transfer of 120 shares from Finn to Pemberton and Brown. In recording this transaction, Finn noted that stock certificate 002 for 750 shares in RRM—Minnesota Corp. was cancelled and replaced by certificates 003, 004 and 005. The stock certificates were then distributed at the July 1, 1987, Board of Directors meeting. On December 29, 1987, Finn marked the certificates issued to Pemberton and Brown "canceled 12/29/87" and indicated that certificate 003 was increased to 750 shares.

On January 28, 1986, Finn opened the first of at least five accounts at the First National Bank of Walker. Each account carried the taxpayer identification number of the RBC as the owner of the account. From October of 1985 through 1990, the Leech Lake Band deposited an estimated $1.5 million into these accounts.[21]

By letter dated June 12, 1987, which was addressed to Burton Howard as the Controller of the RBC, Finn suspended the RBC's insurance coverage. Finn based the suspension on the RBC's failure to make timely premium payments, and he advised that, if RBC did not cure its default by August 1,

---

also served each entity in different capacities—as a shareholder in RRM—Tribal Corp., and as legal counsel to the RBC. As the Indictment makes clear, the Government contends that Finn violated his fiduciary duties to the Leech Lake Band, as its legal counsel, and that Pemberton and Brown owed a duty of loyalty, honesty and integrity to the Leech Lake Band, to the RBC, and to the membership of the Leech Lake Band.

19. As noted, on January 14, 1986, Finn was issued stock certificate 002 for 750 shares in RRM—Minnesota Corp.—however, that entity's Articles of Incorporation were not filed until March 18, 1986.

20. On March 10, 1987, Finn credited Brown in the amount of $12,088, and Pemberton in the amount of $18,000, as payment for their stock ownership in RRM—Minnesota Corp. The Indictment describes how Finn, acting as the Leech Lake Band's lawyer, acquired insurance settlement proceeds and trust account funds that were intended for the closure of the Band's landfill.

21. The account names, dates opened and account numbers were as follows:

1. On January 28, 1986, Finn opened "Reservation Risk Management, Incorp. C/O Harold Finn, P.O. Box 835, Cass Lake, MN 56633," having the account number 03–056–9 (Three months earlier, on October 21, 1985, Finn opened this post office box in the name of "Reservation Risk Management, Inc.").

2. On February 10, 1986, Finn opened "Leech Lake Reservation Business Committee dba Reservation Risk Management C/O Harold Finn, P.O. Box 835, Cass Lake, MN 56633," having account number 608208.

3. On September 28, 1987, Finn opened "Leech Lake Res. Workman's Comp. dba Reservation Risk Management, Inc., P.O. Box 835, Cass Lake, MN 56633," having account number 612432.

4. On September 28, 1987, Finn opened "Leech Lake Res. Workman's Comp. dba Reservation Risk Management, Inc., P.O. Box 835, Cass Lake, MN 56633," having account number 03–182–3.

5. On April 26, 1990, Finn opened "LLRBC dba Res. Risk Management, Inc.," having account number 0–04–22000561.

1987, then RRM, Inc.[22] would close the RBC account. On September 30, 1987, Finn advised the RBC that RRM, Inc. had exercised its forfeiture rights over the reserved fund equity that was owned by the RBC. Finn noted that RBC had paid $330,419 of the $400,000 premium and that RBC's insurance remained suspended. By letter dated October 7, 1987, Finn acknowledged receipt of a portion of the amount owed, submitted an invoice in the amount of $400,000—which represented the next year's premium payment—and advised the RBC that its insurance would remain suspended until the RBC paid a $75,000 advance premium.

On November 20, 1987, the United States Department of the Interior ("DOI"), Office of Inspector General ("OIG"), advised Henry Moller, who was then auditing the Leach Lake Band accounts, that it was seeking more information concerning RRM, Inc. and its relationship to the Leech Lake Band. In particular, the OIG inquired about:

1. The Leech Lake Band's ownership interest in RRM, Inc.;

2. Whether RRM, Inc., was chartered in Minnesota and licensed to perform insurance services in the State;

3. Whether any elected officials of the Leech Lake Band stood to profit from its relationship with RRM, Inc.; and

4. Whether any liability claims had been filed.

In response to this request, Finn stated, in a letter to Moller dated February 18, 1988, that "Reservation Risk Management, Inc. is a privately owned, state chartered corporation." Finn also related that the RBC held a 25% interest in RRM, Inc., and he enclosed a copy of the Articles of Incorporation for RRM—Minnesota Corp.

On April 24, 1989, Brown and, on May 3, 1989, Pemberton, signed a letter explaining certain aspects of the relationship between RBC and RRM, Inc. In relevant part, Brown and Pemberton represented that there were no RBC elected officials who had exercised control or who had shared in the profits of RRM, and that no property insurance premiums were charged to any grant program.

On June 12, 1989, in response to a Bureau of Indian Affairs ("BIA") advisory, which warned about fraudulent practices by insurance carriers, Brown notified the BIA Area Director that, although the RBC had previously obtained permission to contract with unlicensed insurance carriers, the RBC would immediately seek to obtain coverage from a licensed insurance carrier. According to the allegations of the Indictment, these statements of the Defendants, among others, were false and, in some instances, were intended to impede a lawful governmental investigation.

On March 29, 1990, the RBC accepted a proposal from RRM, Inc. to provide risk management services. The RBC authorized Brown and Pemberton to execute a contract for such services, which would be retroactive to October 1, 1989. However, on April 13, 1990, Finn notified the RBC that RRM, Inc. would not provide the risk management services. Finn also transmitted an invoice to the RBC, in the amount of $30,000 that charged for insurance services from October 1, 1989 to March 31, 1990.

The Indictment also describes a lengthy series of transactions in which the Defendants are alleged to have unlawfully obtained money and properties that were owned by the Leech Lake Band and, in some instances, were obtained from Federal grants. The Indictment contends that these funds were unlawfully spent for the personal benefit of one or more of the Defendants. In this respect, the conspiracy Count generally portrays repeated occasions in which Finn, Brown, and Pemberton acquired funds, which the Band had deposited in the accounts at the First National Bank of Walker, for the purchase of liability insurance cover-

22. Due to the similarity in names, and perhaps the duality of the corporations, it is not always clear from the Indictment whether RRM, Inc. refers to RRM—Tribal Corp. or RRM—Minnesota Corp. Since we are not privy to the evidence which underlies the Indictment, we are unable to determine if the descriptor "RRM, Inc." is a product of the Indictment's draftsmanship, or is attributable to the Defendants' usage of the term to interchangeably refer to either of the two corporations. In any event, this duality of meaning is inconsequential to the issues before us.

age. As but one example, the Government has invoked the Federal mail fraud statutes on the basis of the application for certificates of title on two boats that Finn is purported to have purchased with proceeds obtained from the conspiracy. Mail fraud is also alleged on the ground that Finn caused a retailer of one of the boats to file a false sales tax return. The remaining Counts specifically refer to the purported conspiratorial scheme and describe the Defendants' conduct as it relates to the scheme. The details of the transactions, which comprise the substantive Counts of the Indictment, will be addressed in conjunction with the pertinent Motions of the Defendants.

On the basis of this Record, the Defendants challenge the Indictment as being without a Federal jurisdictional basis, and they move to suppress the evidence that relates to the alleged money laundering, as having been collected by a Federal agent who was without investigatory jurisdiction. In addition, the Defendants move to dismiss one Count, and to strike all references relating to an alleged scheme to defraud the State of Minnesota of sales taxes, on the ground that the underlying purchases were exempt from State taxation. Lastly, the Defendants move to dismiss various other Counts of the Indictment as failing to state chargeable Federal offenses.

### III. *Discussion*

For ease of reference, we first address the Motions which most properly lie within our non-dispositive, pretrial jurisdiction, and we then address the Motions which are the subject of our Recommendations.

### A. *Motions Subject to Section 636(b)(1)(A) Jurisdiction.*

#### 1. *Motions to Sever.*

 As a general proposition, the joinder of Defendants in a multiple charge Indictment is permissible where the offenses, of which the Defendants are charged, involve a common activity that embraces all of the charged offenses, even though every Defendant has not participated in all of the activities, and has not been charged with every single offense. *Rule 8(b), Federal Rules of Criminal Procedure; United States v.*

*O'Connell,* 841 F.2d 1408 (8th Cir.1988), cert. denied, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 893 (1988). Moreover, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States,* 506 U.S. 534, 536, 113 S.Ct. 933, 937, 122 L.Ed.2d 317 (1993); *United States v. Payne,* 923 F.2d 595, 597 (8th Cir.1991), cert. denied, 501 U.S. 1219, 111 S.Ct. 2830, 115 L.Ed.2d 1000 (1991). Stated somewhat more dogmatically, "[r]arely, if ever, will it be improper for co-conspirators to be tried together." *United States v. Dijan,* 37 F.3d 398, 402 (8th Cir. 1994), cert. denied, —— U.S. ——, 115 S.Ct. 1418, 131 L.Ed.2d 302 (1995), quoting *United States v. Wint,* 974 F.2d 961, 968 (8th Cir. 1992), cert. denied, 506 U.S. 1062, 113 S.Ct. 1001, 122 L.Ed.2d 151 (1992); *United States v. Stephenson,* 924 F.2d 753, 762 (8th Cir. 1991), cert. denied, 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991), quoting *United States v. Drew,* 894 F.2d 965, 968 (8th Cir. 1990), cert. denied, 494 U.S. 1089, 110 S.Ct. 1830, 108 L.Ed.2d 959 (1990).

 Even if joinder is technically proper, however, Rule 14, Federal Rules of Criminal Procedure, provides relief if specific prejudice is claimed to arise from a joint Trial. In this respect, Rule 14 provides:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

A Defendant "can show real prejudice either by showing that [his] defense is irreconcilable with the defense of [his] codefendant or co-defendants or that the jury will be unable to compartmentalize the evidence as it relates to separate defendants." *United States v.*

*Jackson,* 64 F.3d 1213, 1217 (8th Cir.1995), quoting *United States v. Gutberlet,* 939 F.2d 643, 645 (8th Cir.1991).

Both Pemberton and Brown request a severance of their respective Trials from each of the others. Pemberton contends that the offenses are not properly joined under Rule 8(a), Federal Rules of Criminal Procedure, and that the Defendants are not properly joined under Rule 8(b), Federal Rules of Criminal Procedure. In addition, both Pemberton and Brown contend that they will suffer prejudice from their joint Trial and, therefore, relief pursuant to Rule 14, Federal Rules of Criminal Procedure, is warranted.

 Under the settled law of this Circuit, where, as here, the case involves jointly indicted Defendants, a claim that offenses have been misjoined is analyzed under Rule 8(b). See, *United States v. Jones,* 880 F.2d 55 (8th Cir.1989) (in cases involving jointly indicted multiple defendants, "the propriety of the initial joinder is governed by 8(b)"). See also, 1 C. Wright, *Federal Practice and Procedure* § 144, at 494 (2d Ed.1982) (quoted in *United States v. Jones,* supra) ("It is firmly established in the case law that the propriety of joinder in cases where there are multiple defendants must be tested by Rule 8(b) alone and that Rule 8(a) has no application."). The significant difference between the two sections is that Rule 8(a) permits joinder of offenses of "the same or similar character" and Rule 8(b) does not.[23]

Pemberton alleges a misjoinder because, in his view, not all of the offenses charged in the Indictment arose out of the "same series of acts or transactions." The Courts have interpreted this language to require some common activity, that involves all of the Defendants and that embraces all of the charged offenses, but it is not necessary for each Defendant to have participated in each

act or transaction within that series of events. See, *United States v. O'Connell,* supra at 1431; *United States v. Andrade,* 788 F.2d 521, 529 (8th Cir.1986), cert. denied, 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 408 (1986).

 Here, fairly read, the Indictment reveals a basis for joinder on its face. See, *United States v. Andrade,* supra ("Generally, the propriety of the joinder must appear on the face of the indictment".). Pemberton was joined with Finn and Brown in a single Count of conspiracy—the object of which, assertedly, was to steal money from the Leech Lake Band, to defraud the State of Minnesota of sales tax revenue, and to conceal the conspiracy. In furtherance of this objective, one or more of the Defendants are charged with using the mails, engaging in money laundering activities, and uttering false statements. Unquestionably, these allegations are sufficient to denote the Government's belief that the Defendants participated "in the same series of acts or transactions constituting an offense or offenses" so as to render their joinder proper. *Rule 8(b), Federal Rules of Criminal Procedure;* see also, *United States v. Houston,* 892 F.2d 696 (8th Cir.1989) (joinder proper where Indictment charged all of the Defendants with participation in a single conspiracy, and charged several of the Defendants with various substantive counts arising from the same conspiracy).

 Next, Pemberton joins Brown in arguing that, even if their joinder was technically proper, each Defendant is entitled to severance under Rule 14, Federal Rules of Criminal Procedure. As noted, Rule 14 authorizes a Trial Court to grant a severance if a Defendant would be prejudiced by a joint Trial. In order to prevail under Rule 14, Pemberton and Brown must each make a

---

**23.** Rule 8(a) may be contrasted with Rule 8(b), as follows:

(a) Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts connected together or constituting parts of a common scheme or plan.

(b) Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

showing of real prejudice to themselves individually.

In this respect, Pemberton and Brown urge severance on the ground that each has a defense which is inconsistent and antagonistic to the other Defendants. In particular, Pemberton contends that he will claim that he relied upon the advice of Finn who served as the Band's legal counsel. Pemberton does not relate, however, how he relied on Finn's advice, nor how his defenses would be irreconcilable with any evidence that Finn or Brown might proffer. See, *United States v. Robinson,* 774 F.2d 261, 267 (8th Cir.1985) (to establish prejudice, a defendant must at least show that the defenses were irreconcilable). Moreover, "[m]utually antagonistic defenses are not prejudicial per se." *Zafiro v. United States,* supra at 538, 113 S.Ct. at 938. Rather, severance should be granted only if there is "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.*

Here, the Court has not been presented with any contention that any of the Defendants will testify to the innocence of the others, or that any of the Defendants will be precluded from proffering exculpatory testimony in favor of any co-Defendant. While, in a conclusory fashion, Pemberton asserts that evidence may be introduced at a joint trial that would not be admissible at individual severed trial proceedings, such a bald assertion is unavailing as the Courts have consistently declined to grant severance in the absence of a particularized showing of prejudice. See, e.g., *United States v. Jackson,* 549 F.2d 517, 524, n. 4 (8th Cir.1977), cert. denied, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977). In order to obtain a severance on this ground, "a defendant must show that the codefendant is likely to testify at a separate trial and that the testimony would substantially exculpate him." *United States v. Lucht,* 18 F.3d 541, 553 (8th Cir. 1994), cert. denied, —— U.S. ——, 115 S.Ct. 363, 130 L.Ed.2d 316 (1994), citing *United States v. DeLuna,* 763 F.2d 897, 920 (8th Cir.1985), cert. denied, 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985). Moreover,

even if we were to assume the likelihood of exculpatory testimony from a co-Defendant, severance is not required. As stated in *United States v. Foote,* 920 F.2d 1395, 1399–1400 (8th Cir.1990), cert. denied, 500 U.S. 946, 111 S.Ct. 2246, 114 L.Ed.2d 487 (1991):

> The question of whether severance should be granted cannot be answered in isolation by considering only the allegedly exculpatory evidence. The answer comes from examining the underlying acts which support the charges levied against the defendants, the nature of the evidence which the government has to prove those charges, and finally the nature of the exculpatory evidence. The last item should be able to meet and genuinely call into doubt the second by more than mere denial before the government is required to make separate and duplicative cases against co-conspirators.

Moreover, we are unpersuaded by the Defendants' contention that the Jury will be unable to separate the evidence against each of them. At this preliminary juncture, we have not been presented with any cogent showing that the evidence at Trial will be so complex or confusing that the Jury will be unable to make individualized guilt determinations, or that the Jury will be disposed to cumulate the evidence against each Defendant. Rather, it appears to us that the roles played by each of the Defendants were sufficiently distinct to enable the jury, on proper instruction, to compartmentalize the evidence against each Defendant. See, *Zafiro v. United States,* supra at 540, 113 S.Ct. at 939 (even if there were some risk of prejudice, that risk was cured by the Court's use of instructions to the Jury); *United States v. Thornberg,* 844 F.2d 573, 579 (8th Cir.1988) (limiting instructions "does much to reduce the prejudice against a defendant in a joint trial"), cert. denied, 487 U.S. 1240, 108 S.Ct. 2913, 101 L.Ed.2d 944 (1988).

The remaining arguments of Pemberton, for a severance of his Trial, may be summarily addressed. He asserts that he will be prejudiced because of the overwhelming evidence that relates exclusively to Finn. Nevertheless, there is no requirement that, in order to allow a joint Trial, the evidence

against each defendant must be quantitatively or qualitatively equivalent. *United States v. Jones*, supra at 63, citing *United States v. O'Connell*, supra at 1432. Similarly, we reject his claim to severance on the ground that "significant *Bruton* issues" exist in this case, because he provided several statements to the Government. In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that the admission of a non-testifying co-defendant's statement, which inculpated a defendant by name, violated the Defendant's Sixth Amendment right to confront witnesses against him, even if a cautionary instruction were to be given to the Jury. However, as our Court of Appeals has stated, "the Confrontation Clause is not violated by the admission of a non-testifying codefendant's confession * * * when * * * the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *United States v. Comeaux*, 955 F.2d 586, 590 (8th Cir.1992), cert. denied, 506 U.S. 845, 113 S.Ct. 135, 121 L.Ed.2d 89 (1992) (quoting *United States v. Donahue*, 948 F.2d 438, 443 (8th Cir.1991), cert. denied, 503 U.S. 976, 112 S.Ct. 1600, 118 L.Ed.2d 314 (1992) (in turn quoting *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987))). Here, the Government has represented that any issues, which arise from the Court's holding in *Bruton*, may be properly resolved by redacting those statements that were made by a Defendant so as not to implicate any co-Defendant. We agree.

Lastly, we would observe that the evidence before us is sufficient to confirm that each Defendant is accused of being involved in the same course of criminal conduct, and that no "showing of real prejudice" has been presented such as would properly outweigh the obvious judicial economy that a joint Trial would achieve. *United States v. Roach*, 28 F.3d 729, 738 (8th Cir.1994); *United States v. Garrett*, 961 F.2d 743, 746 (8th Cir.1992); *United States v. Givens*, 712 F.2d 1298, 1300 (8th Cir.1983), cert. denied, 465 U.S. 1009, 104 S.Ct. 1005, 79 L.Ed.2d 237 (1984). As a consequence, we deny the Motion of Pemberton and Brown to sever.

2. *Motion for a Bill of Particulars.*

█ A Bill of Particulars is intended to permit a Defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling the defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir.1987) (per curiam); see also, *United States v. Arenal*, 768 F.2d 263, 268 (8th Cir.1985); *United States v. Miller*, 543 F.2d 1221, 1224 (8th Cir.1976), cert. denied, 429 U.S. 1108, 97 S.Ct. 1142, 51 L.Ed.2d 561 (1977).

█ However, a Bill of Particulars is not intended to be a substitute for discovery, nor is it designed to provide information which the Defendant might regard as generally helpful, but which is not essential to his defense. *United States v. Wessels*, 12 F.3d 746, 750 (8th Cir.1993), cert. denied, —— U.S. ——, 115 S.Ct. 105, 130 L.Ed.2d 53 (1994), citing *United States v. Hester*, 917 F.2d 1083, 1084 (8th Cir.1990); *United States v. Matlock*, 675 F.2d 981, 986 (8th Cir.1982) ("Acquisition of evidentiary detail is not the function of the bill of particulars."); *United States v. Hill*, 589 F.2d 1344, 1352 (8th Cir. 1979), cert. denied, 442 U.S. 919, 99 S.Ct. 2843, 61 L.Ed.2d 287 (1979); *United States v. Little*, 562 F.2d 578, 581 (8th Cir.1977); *United States v. Chevalier*, 776 F.Supp. 853, 856 (D.Vt.1991); *United States v. Guerrerio*, 670 F.Supp. 1215, 1224 (S.D.N.Y.1987). In sum, "[t]he purpose of a bill of particulars is to inform the defendant of the nature of the charges against him and to prevent or minimize the element of surprise at trial." *United States v. Matlock*, supra quoting *United States v. Miller*, supra. The Bill should not issue where the specifics requested by the Defendants are readily available elsewhere. *United States v. Bortnovsky*, supra at 574; *United States v. Chevalier*, supra at 853. With these precepts in mind, we address Finn's Motion, as adopted by Brown and Pemberton, for a Bill of Particulars.

█ The Defendants seek a particularization of those Counts in the Indictment which allege a conspiracy, money laundering activities, and mail fraud. As an illustration, the

Defendants have requested a specification, beyond the particulars of the Indictment, of the identities of the other participants in the conspiracy, and the dates and locations of the particular acts in which each is alleged to have participated. In addressing this request, we have reviewed the allegations of the Indictment and we find them to be sufficient in informing the Defendants of the nature of the charges against them. *United States v. Sileven*, 985 F.2d 962, 966 (8th Cir.1993) (District Court properly denied Bill of Particulars where the Indictment sufficiently informed the Defendant of the nature of the charges against him).

As we have noted, the Defendants are charged in 26 Counts of an Indictment, that spans 68 pages and that delineates, in substantial detail, a progression of overt acts. With respect to the conspiracy Count, the Indictment is specific as to the objects of the conspiracy, as well as to the means by which the conspiracy is said to have been accomplished. See, *United States v. Persico*, 621 F.Supp. 842, 868 (N.Y.1985) ("Details as to how and when the conspiracy was formed or when each participant entered it, need not be revealed before trial."). As to those Counts which have alleged a money laundering enterprise, we note that dates, amounts, and localities have been presented for each alleged offense. Likewise, the mail fraud Counts describe the dates and the specific objects that the Defendants, purportedly, had caused to be mailed. Although the allegations are not as detailed as the Defendants may prefer, that is not the test we apply. A Bill of Particulars serves an essential function in eliminating surprise, but the Bill was not designed to substitute for pretrial discovery.[24]

Accordingly, absent a showing of need, we find no basis to Order the provision of a Bill of Particulars for, to do so, would be to acquiesce in a particularized discovery, in the guise of a supplementation of an Indictment, which is well beyond the province of the Bill. We, therefore, deny the Defendants' Motion for a Bill of Particulars.

3. *Motion For The Disclosure Of Grand Jury Instructions, Minutes And Transcript, Or For An In Camera Review Of The Same.*

The disclosure of Grand Jury minutes is encompassed within Rule 6(e)(3)(C)(ii), Federal Rules of Criminal Procedure. The Rule provides that a disclosure of the Grand Jury materials may be made "when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." To secure grand jury materials, however, the defendant must show a "particularized need" for the information. See, *United States v. Broyles*, 37 F.3d 1314, 1319 (8th Cir.1994), cert. denied, —— U.S. ——, 115 S.Ct. 1441, 131 L.Ed.2d 320 (1995); *United States v. Warren*, 16 F.3d 247, 253 (8th Cir.1994). A "particularized need" is demonstrated by the presentation of "specific evidence of prosecutorial overreaching." *United States v. Lame*, 716 F.2d 515, 518 (1983). As a consequence, a defendant who "has not pointed to anything in the record which might suggest that the prosecution has engaged in improper conduct before the grand jury" has failed to carry his burden. *Id.*, quoting *United States v. Edelson*, 581 F.2d 1290, 1291 (7th Cir.1978), cert. denied, 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979).

Here, Finn makes two assertions in the way of a particularized need.[25] First, he suggests that access to the Grand Jury materials would be relevant in determining whether the Government properly apprised the Grand Jury of exculpatory evidence. In this

---

**24.** While we have no doubt that the Defendants are desirous of other factual details, we are satisfied that the pretrial discovery, that the Court has allowed, will eliminate any potential for surprise at trial. *United States v. Wessels*, 12 F.3d 746, 750 (8th Cir.1993), cert. denied, —— U.S. ——, 115 S.Ct. 105, 130 L.Ed.2d 53 (1994) (Bill of Particulars "is not to be used to provide detailed disclosure of the government's evidence at tri-al."), citing *United States v. Automated Medical Laboratories, Inc.*, 770 F.2d 399, 405 (4th Cir. 1985).

**25.** Subsequent to the Hearing, Brown notified the Court of his intent to join in the Motion, but his submission adds nothing to the argument that Finn has made to the Court.

respect, Finn believes that the obstruction of justice charge has been premised upon the testimony that was presented to the Grand Jury by the RBC controller who, according to Finn, may have altered his testimony on occasion. Since more than one Grand Jury may have received evidence on this matter, Finn claims that he is entitled to the Grand Jury materials in order to determine whether the Grand Jury was fully apprised of the witness's "lack of candor." We disagree.

 The rule is well-settled that a defendant may not challenge an Indictment on the ground that evidence favorable to a defendant had not been presented to the Grand Jury. See, *United States v. Williams*, 504 U.S. 36, 46, 112 S.Ct. 1735, 1742, 118 L.Ed.2d 352 (1992) (District Court may not dismiss Indictment on ground that the Government failed to disclose to Grand Jury "substantial exculpatory evidence" in its possession); *United States v. Boykin*, 679 F.2d 1240, 1246 (8th Cir.1982) (defendant "may not challenge an indictment on the ground that information which he considered favorable to his defense was not presented to the grand jury"). A Grand Jury proceeding is not a mini-Trial, *United States v. Civella*, 666 F.2d 1122, 1127 (8th Cir.1981) and, as the Supreme Court observed in *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956), "[a]n indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of charge on the merits." [26]

 In addition, Finn seeks the instructions that were given to the Grand Jury, and that related to the definition of an ITO. As Finn emphasizes, an essential element of a Section 1163 offense is the presence of an ITO as a victim of the asserted criminal conduct. In support of his request, Finn relies on *United States v. White Horse*, 807 F.2d 1426 (8th Cir.1986), in which the Court reversed a defendant's conviction, under Section 1163, because the Trial Court instructed the Jury that the entity involved was an ITO. Accordingly, Finn requests access to the Grand Jury's instructions in order to ensure that the Grand Jury was properly allowed to make a determination, on the ITO element, for itself.

 Nevertheless, we find Finn's reliance on *United States v. White Horse* to be misplaced. Under the prevailing law of this Circuit, the prosecutor is not under an obligation to provide the Grand Jury with any legal instructions. See, *United States v. Zangger*, 848 F.2d 923, 925 (8th Cir.1988) (Indictment should not have been dismissed because of prosecutor's failure to instruct the Grand Jury on the applicable law of obscenity). See also, *United States v. Buchanan*, 787 F.2d 477, 487 (10th Cir.1986) (rejecting an attack on an erroneous legal instruction that had been provided to the Grand Jury). Therefore, a challenge to an instruction to the Grand Jury is not a proper basis for the dismissal of an Indictment that is valid on its face.

 Thus, even if we assumed that the information, which related to a witness's lack of candor had not been presented to the Grand Jury, and if we further assumed that the Grand Jury was improperly instructed as to the definition of an ITO, for purposes of Section 1163, we would not dismiss the related Counts of the Indictment, and we would have no permissible basis to invade the secrecy of the Grand Jury proceedings, as Finn has requested. Accordingly, because he has failed to demonstrate any basis to do so, we deny Finn's Motion for Disclosure and Examination of Grand Jury materials.[27]

---

**26.** Of course, if the sole basis of the obstruction of justice Count is, indeed, the testimony of the RBC's controller as presented to the Grand Jury, Finn will have the opportunity to examine that testimony, and all of that witness's previous Grand Jury testimony, by means of the Jencks Act, *Title 18 U.S.C. § 3500*. See, e.g., *United States v. Mechanik*, 475 U.S. 66, 80, 106 S.Ct. 938, 946, 89 L.Ed.2d 50 (1986) (Marshall, J., dissenting) (defendant's access to Grand Jury materials will likely be through the medium of the Jencks Act).

**27.** As an alternative, the Defendants request that this Court conduct a preliminary *in camera* examination of the relevant Grand Jury materials. While we recognize that, in certain instances of serious prosecutorial misconduct, an *in camera* review of the Grand Jury materials would be advisable, we are not confronted by that circum-

#### 4. *Motion to Compel the Sentencing Guidelines Information.*

■ Finn, in a Motion that Brown has joined, requests the Government to disclose information that would pertain to the Federal Sentencing Guidelines. While we do not wish to discourage the free exchange amongst the parties of information concerning the Sentencing Guidelines, we find no basis to direct the Government to affirmatively provide this information to the Defendants. As to certain of the Guidelines' factors, the operative information is more readily available to the Defendants than to the Government, and the factors at play, in the ascertainment of a sentencing range, are equally accessible to all parties. Perhaps, if the full complement of Pretrial Services were not available in this District, a more compelling argument could be advanced for the relief that the Defendants request but, in the absence of a particularized need for the information, we are unpersuaded that any legitimate interest is furthered by imposing an additional burden upon the Government to disclose its interpretation of the Sentencing Guidelines.

Ultimately, the Government's translation of the Sentencing Guidelines is no more dispositive of the sentencing issues than the Defendants' interpretation and, in the absence of a pressing need for the information, or some cogent legal authority, we deny the Motion as without merit. Of course, the Defendants remain at liberty to request the Government's construction of the Sentencing Guidelines, in addition to the interpretation provided by Pretrial Services, and we would encourage—but will not compel—the Government to fully respond.

#### 5. *Motion For The Disclosure Of Post–Conspiracy Statements Of Co–Defendants.*

■ Rule 16, Federal Rules of Criminal Procedure regulates the Defendants' discovery of evidence in possession, custody or control of the Government. By this Motion, Finn seeks the disclosure of the post-conspiracy statements of a co-Defendant.

In addressing the scope of Rule 16, our Court of Appeals has interpreted the Rule as meaning "that only statements made by the defendant" are discoverable. *United States v. Manthei,* 979 F.2d 124, 126 (8th Cir.1992). Similarly, in *United States v. Hoelscher,* 914 F.2d 1527, 1535 (8th Cir.1990), cert. denied, 498 U.S. 1090, 111 S.Ct. 971, 112 L.Ed.2d 1057 (1991), the Court concluded that Rule 16 did not cover "testimony by a government witness as to an oral statement by a conspirator in the course of the conspiracy." *Id.,* at 1535. Rather, Rule 16 covers statements "made by a Defendant" in response to an interrogation by a Government agent. *Id.*

Relying upon *Bruton v. United States,* supra, Finn claims that a disclosure is necessary in order to determine whether any of the statements imply that he was involved in the conspiracy. As noted, however, under the law of this Circuit, *Bruton* is not violated when the statements of a co-Defendant are redacted so as to eliminate any reference to a Defendant. See, *United States v. Comeaux,* supra at 590; *United States v. Donahue,* supra at 443. Since the Government has represented that any *Bruton* concerns will be resolved by an appropriate redaction of the statements of a co-Defendant, we deny Finn's Motion as being without merit.

#### 6. *Motion For Leave To Issue Rule 17(c) Subpoenas Without A Particularized Showing To The Court.*

Pursuant to Rule 17(c), Federal Rules of Criminal Procedure, the Defendant in a criminal proceeding may obtain a Subpoena *duces tecum* directing the recipient to produce documents or other materials. See, *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984). In this respect, Rule 17(c) provides as follows:

> A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or objects designated in the subpoena be produced

stance here. See, *United States v. Singer,* 660 F.2d 1295, 1302 n. 15 (8th Cir.1981), cert. de-

nied, 454 U.S. 1156, 102 S.Ct. 1030, 71 L.Ed.2d 314 (1982).

before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys.

In *Bowman Dairy Co. v. United States,* 341 U.S. 214, 220, 71 S.Ct. 675, 678, 95 L.Ed. 879 (1951) the Supreme Court made clear that "Rule 17(c) was not intended to provide an additional means of discovery." Rather, "[i]ts chief innovation was to expedite the trial by providing a time and place *before* trial for the inspection of the subpoenaed materials." *Id.* [Emphasis in original].

██ Following *Bowman,* the Courts have routinely followed the test formulated in *United States v. Iozia,* 13 F.R.D. 335, 338 (S.D.N.Y.1952), when deciding whether to require the production of documents prior to Trial. "Under this test, in order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition'." *United States v. Nixon,* 418 U.S. 683, 699–700, 94 S.Ct. 3090, 3103, 41 L.Ed.2d 1039 (1974). Accordingly, in order to carry its burden, the requesting party must "clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." *Id.* at 300; *United States v. Kalter,* 5 F.3d 1166, 1169 (8th Cir.1993).

██ Here, Pemberton requests a Standing Order which would allow his counsel to issue Subpoenas, pursuant to Rule 17(c), without a prior Motion to this Court. Although Pemberton does not cite a case, which is purported to establish any such right to proceed without the involvement of the Court, he correctly observes that, if the recipient objects to the Subpoena after its service, then Rule 17(c) would provide a mechanism for challenging the propriety of the Subpoena by a Motion to Quash.

In response, the Government cautions that a Standing Order, which would authorize Pemberton, without supervision, to issue a Subpoena of this Court, would create a dangerous precedent. In the Government's view, Rule 17(c) does not invest the Court with the discretion to grant Pemberton such a limitless exercise of the Court's Subpoena power. We agree. Clearly, we would be forfeiting our obligation and responsibility of assuring that Rule 17(c) subpoenas were being utilized to gather specific evidence that would be both relevant and admissible, were we to authorize the Defendant to issue such a Subpoena without Court intercession.

Without the Court's supervision, Rule 17(c) would lend itself to discovery of the broadest sort—a result that the drafters of the Rule decried. See, *United States v. Nixon,* supra at 698, 94 S.Ct. at 3102; *Bowman Dairy Co. v. United States,* supra at 220, 71 S.Ct. at 678 ("It was not intended by Rule 16 to give a limited right of discovery, and then by Rule 17 to give a right of discovery in the broadest of terms."); 2 *Wright, Federal Practice and Procedure: Criminal* § 274 at 153 and n. 16 (1982) ("[I]t has always been clear that Rule 17(c) was not intended as a discovery device * * *."), and cases cited therein. Accordingly, we agree with the rationale employed in two recent District Court opinions, for the District of New York, which have recognized the desirability of a Court's review of Rule 17(c) subpoenas prior to their issuance.

In *United States v. Urlacher,* 136 F.R.D. 550 (W.D.N.Y.1991), the Court acknowledged that Rule 17(c) contemplates a Court's capacity to review the propriety of a pretrial subpoena duces tecum during a Motion to Quash, but the Court preferred to address the legitimacy of the information requests prior to the subpoena's issuance. As the Court noted, the Defendant had, by its filing of a Motion for the issuance of the subpoena, sought the "court's aid in the matter, which will ensure the judicial supervision contemplated by subdivision (c) at the earliest stage." *Id.* at 554–55. Similarly, in *United States v. Ashley,* 162 F.R.D. 265, 266 (E.D.N.Y.1995), the Court concluded that

"the motion for issuance is appropriate, though not strictly necessary, and should be entertained by the court." *Id.,* at 266, (quoting *United States v. Urlacher,* supra). See also, *United States v. Ferguson,* 37 F.R.D. 6, 8 (D.C.D.C.1965) (Court vacated, without prejudice, Subpoena *duces tecum* on the ground that "no direction was obtained from the Court").

■ Implicit in Pemberton's Motion for a Standing Order is the related issue of whether Pemberton must notify the Government of its application for a Subpoena. The Government asserts that such notification is required under the plain language of Rule 17(c), and cites to the language of the Rule which provides that the Court may permit the documents "to be inspected by the parties and their attorneys." Of course, we need not hold, and do not hold, that every Subpoena *duces tecum* requires a disclosure of its contents to the opposing party, for Rule 17(c) does not evince any such intent. Rather, we only decide that, when the Rule is utilized for the disclosure of evidentiary materials in advance of Trial, the application should be reviewable by the other parties to that proceeding. In *United States v. Urlacher,* supra at 555–58, the Court thoroughly addressed the impropriety of such an *ex parte* request, leading one of the eminent treatises to conclude that, "[i]f a [Rule 17(c) ] Motion is made it cannot be ex parte." 2 *Wright, Federal Practice and Procedure: Criminal* § 274 at p. 46 of 1995 Pocket Part; see also, *United States v. Hart,* 826 F.Supp. 380, 381 (D.Colo.1993) (Rule 17(c) negates any assumption that production should be on an ex parte basis); *United States v. Ferguson,* supra at 8 (Court vacated, without prejudice, Subpoena *duces tecum* on the ground that "no direction was obtained from the Court.").

Accordingly, we deny Pemberton's Motion for leave to issue Rule 17(c) Subpoenas without a particularized showing to the Court, and we further direct that, in requesting an Order for the issuance of a pretrial Subpoena, the Defendants duly notify the Government of their request.[28]

B. *Motions Subject to Section 636(b)(1)(B) Jurisdiction.*

1. *The Motion To Dismiss The Indictment For Want Of Subject Matter Jurisdiction.*

The Defendants have moved to dismiss the Indictment against them, arguing that the Government is without the requisite subject matter jurisdiction to prosecute the indicted offenses. In support of this argument, the Defendants rely upon Public Law 280, which was enacted in 1953, and which provides in relevant part:

> (a) Each of the States or Territories listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over offenses committed elsewhere within the State or Territory, and the criminal laws of such State or Territory shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory:
>
> \* \* \* \* \* \*
>
> Minnesota.....All Indian country within the State, except the Red Lake Reservation.
>
> \* \* \* \* \* \* .
>
> (c) The provisions of sections 1152 and 1153 of this chapter shall not be applica-

---

**28.** Of course, an *ex parte* application, for the production of documents in advance of trial, would fare no better if it emanated from the Government under like or similar circumstances. Whatever else may be said of Rule 17(c), it is unqualifiedly even-handed in its approach. More importantly, if the restrictions of Rule 17(c), upon full-bodied discovery in criminal proceedings, should appear to be unduly constraining, then the answer would seem to lie in its amendment so as to provide for a more expan-

sive exploration into the documentary evidence of third-persons. We note, however, that in the half-century or so, in which Rule 17(c) has been operative, the provisions at play here have not been the subject of any substantive modification. Lastly, we suspect that, given the breadth of the Defendant's proposed Rule 16, Jencks Act and *Brady*-type discovery, the critical information that he seeks to obtain through Rule 17(c), will be accessible through other readily available avenues.

ble within the areas of Indian County listed in subsection (a) of this section as areas over which the several States have exclusive jurisdiction.

Act of August 15, 1953, ch. 505, 67 Stat. 588. Public Law 280 is codified at Title 18 U.S.C. § 1162, Title 25 U.S.C. §§ 1321–1326, and Title 28 U.S.C. § 1360.

The Defendants contend that, in adopting Public Law 280, Congress necessarily vested the State of Minnesota with exclusive jurisdiction over all crimes committed within the Indian country, situated in this State, with the exception of the Red Lake Reservation. Since the Red Lake Reservation is not implicated in any of the activities of the Defendants, they conclude that the Federal Government has no authority to prosecute the Federal violations of which the Defendants are accused. In response, the Government urges that Public Law 280 did no more than, in effect, cede to the State of Minnesota the Federal Government's jurisdiction which is prescribed by Title 18 U.S.C. §§ 1152 and 1153, and that, notwithstanding the Defendants' encouragement to do so, we should reject their request that we interpret Public Law 280 as a complete abandonment of Federal jurisdiction over crimes committed within specified segments of the Indian country.[29]

■ At the outset, we acknowledge that, as the Supreme Court has expressly recognized, in assessing the contours of the laws which govern the commission of crimes upon an Indian Reservation, we are confronted with "a complex patchwork of federal, state and tribal laws." See, *Negonsott v. Samuels*, 507 U.S. 99, 101, 113 S.Ct. 1119, 1121, 122 L.Ed.2d 457 (1993), (quoting *Duro v. Reina*, 495 U.S. 676, 680 n. 1, 110 S.Ct. 2053, 2057 n. 1, 109 L.Ed.2d 693) (1990) ("Criminal jurisdiction over offenses committed in 'Indian country,' which is defined in 18 U.S.C. § 1151, is governed by a complex patchwork of federal, state and tribal laws."). As is the case with any mosaic, however, its substance is best discerned when viewed as an integrated whole. Our analysis, therefore, requires the perspective shed by the unique history and development of this specialized aspect of the law.

■ In considering the merits of the parties' respective interpretations of Public Law 280, we begin where we must, with an appreciation of the context in which this enactment evolved. See, *United States v. Johnson*, 637 F.2d 1224, 1230 (9th Cir.1980) (familiarity with the development of Federal criminal jurisdiction over Indians is a "useful starting point"). As all parties concede, Congress has the exclusive and plenary authority to regulate the conduct of Indians within Indian country. *Ex parte Crow Dog*, 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883). To this end, Congress has long conferred upon the Federal Courts special jurisdiction over those criminal activities that have occurred on Indian Reservations. F. Cohen, *Handbook of Federal Indian Law* at 286 (1982 Ed.). In most instances, the Court's authority in such matters emanates from either the Indian Country Crimes Act or the Major Crimes Act.

■ The Indian Country Crimes Act, which is codified at Title 18 U.S.C. § 1152, extends the Federal "enclave laws" to Indian

---

29. In the alternative, the Government contends that, because the alleged offenses did not wholly take place within the boundaries of an Indian Reservation, the jurisdictional issue need not be considered. Indeed, the plain language of Public Law 280 limits its jurisdictional grant to "offenses committed * * * in the areas of [designated] Indian country." In support of its contention that the crimes were committed outside of the Reservation's premises, the Government refers to the situs of the pertinent bank accounts and of the various Board of Directors meetings—all of which were located in Walker, Minnesota—an area that, admittedly, is not encompassed within the boundaries of the Leech Lake Reservation.

In response, the Defendants assert that it is not clear from the Indictment whether the alleged offenses were committed within or outside of the Reservation's boundaries. While we agree that the Indictment does not expressly identify what conduct by the Defendants occurred on or off of the Reservation's premises, we do not reach the issue of whether that omission constitutes a jurisdictional defect, since we conclude that, in enacting Public Law 280, Congress did not cede the exclusive jurisdiction, over the charged offenses, to the State of Minnesota. Accordingly, the situs of the assertedly offensive conduct is irrelevant to our further analysis.

country.[30] Section 1152, however, does not purport to encompass those Federal laws that criminalize conduct irrespective of where that conduct occurs. As a consequence, our Court of Appeals determined, in *United States v. Blue*, 722 F.2d 383, 384 (8th Cir. 1983), that Section 1152 did not "extend or restrict the application of general federal criminal statutes to Indian reservations." In practical effect, Section 1152 "refers only to those laws where the situs of the offense is an element of the crime." *Stone v. United States*, 506 F.2d 561, 563 (8th Cir.1974), cert. denied, 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 659 (1975); see also, *United States v. White*, 508 F.2d 453 (8th Cir.1974).

Moreover, Section 1152 excepts from its coverage those enclave—or situs-restricted—offenses which have been "committed by one Indian against the person or property of another Indian." In its 1883 decision in *Ex parte Crow Dog*, supra, the Supreme Court relied upon this exception in concluding that Federal Courts did not possess the jurisdiction to try an Indian on charges that he had murdered a fellow Indian on Reservation properties. However, in response to the Court's holding in *Ex parte Crow Dog*, Congress extended, in 1885, the Federal Court's jurisdiction over a number of offenses that are committed by one Indian against another, through the enactment of the Major Crimes Act. The Major Crimes Act, which is codified at Title 18 U.S.C. § 1153, currently lists fourteen specific offenses as constituting·Federal crimes, if committed by one Indian upon another.[31]

■ As all concede, the offenses, for which the Defendants have been indicted, are not among those specified in Section 1153 nor, as the Government correctly points out, are the offenses premised upon the Court's enclave jurisdiction under Section 1152. Rather, the asserted violations are, admittedly, Federal crimes of general applicability.[32] As to such generally applicable criminal statutes, there can be no serious contention that Sections 1152 and 1153 have displaced their applicability to crimes that have been committed in Indian country. Indeed, with uniformity, the Courts have rejected any such contention, and have concluded that the generally applicable provisions of the Federal Criminal Code govern, with equal force, the prosecution of the pertinent crimes as they should be committed by Indians in Indian country. See, e.g., *United States v. Blue*, supra (Federal narcotics violation); *Stone v. United States*, supra (assault on a Federal officer); *United States v. McGrady*, 508 F.2d

---

**30.** Section 1152 provides as follows:

> Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except in the District of Columbia, shall extend to the Indian country.
>
> This section shall not extend to offenses committed by one Indian against the person or property of another Indian, not to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

The current version of the statute has not been substantively amended since 1854. *F. Cohen, Handbook of Federal Indian Law* at 288 (1982 Ed.).

**31.** In pertinent part, Section 1153 provides:

> Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, assault with intent

to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses within the exclusive jurisdiction of the United States.

With the exception of burglary and incest, the offenses are defined in the Federal Criminal Code, and they include the situs of the offense as an element of the crime. Burglary and incest are defined by reference to State law, since they are intended for enclaves under the Assimilative Crimes Act. See, *Title 18 U.S.C. § 13.*

**32.** There is no dispute that the offenses, which have been charged in the Indictment, involve statutes of general applicability. None of the charged offenses—conspiracy, mail fraud, money laundering, false statement, obstruction of justice, conversion of tribal funds, or theft involving a program receiving tribal funds—includes, as an element of the offense, the situs at which the offense occurred.

13 (8th Cir.1974) (conversion of Indian Funds), cert. denied, 420 U.S. 979, 95 S.Ct. 1408, 43 L.Ed.2d 661 (1975); *United States v. Yannott*, 42 F.3d 999 (6th Cir.1994) (firearms possession), cert. denied, — U.S. —, 115 S.Ct. 1172, 130 L.Ed.2d 1125 (1995); *United States v. Young*, 936 F.2d 1050 (9th Cir.1991) (assault on a Federal officer); *United States v. Burns*, 529 F.2d 114 (9th Cir.1976) (firearms possession); *United States v. Three Winchester 30–30 Caliber Lever Action Carbines*, 504 F.2d 1288 (7th Cir.1974) (firearms possession).[33]

In fact, the Defendants do not argue to the contrary. Rather, they assert that Public Law 280 categorically withdrew all Federal criminal jurisdiction over those crimes, which involve the acts of one Indian against another, when the acts occurred within the designated Indian Country—inclusive of the Leech Lake Reservation in Minnesota. They emphasize that, while numerous decisions have addressed the extent to which Federal criminal laws of general application can be imposed upon Indians in Indian country, not one of those decisions has addressed whether an Indian may be convicted of committing a generally applicable Federal crime, which occurred within the Indian country designated in Public Law 280. With one slender excep-

tion,[34] we agree and, therefore, we concur in the parties' observation that the issue presented is one of first impression.

Quite logically, in analyzing the parties' respective contentions, we begin with the text of Public Law 280. See, *Consumer Product Safety Comm'n. v. GTE Sylvania*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("the starting point for interpreting a statute is the language of the statute itself"). As we have noted, Public Law 280 was enacted in 1953, in order to delegate jurisdiction to five—later six— States over most crimes, and many civil matters, that should occur within much of the Indian country within their State borders.[35] In addition, the Act offered any other State the option of adopting the same extension to its jurisdiction.[36] In defining the extent of its grant of criminal jurisdiction to the listed States, the Act expressly caveated that the designated States would have "jurisdiction over offenses committed by or against Indians in the areas of Indian country listed[,] * * * to the same extent that such State * * · * has jurisdiction over offenses committed elsewhere within the State." By this language, it is clear that Congress was not expanding the inherent jurisdiction of the designated States so as to prosecute all Fed-

**33.** In *United States v. White*, 508 F.2d 453 (8th Cir.1974), the Court noted that where a particular Indian right or policy is infringed by a general Federal criminal law, that law will be held not to apply to Indians on Reservations unless specifically so provided. There, the Court held that because hunting rights had been reserved in earlier treaties, and were governed by tribal law, the Federal criminal law, which prohibited the hunting of bald eagles, did not apply to Indians on Reservations. In the present case, however, the Defendants do not claim that a particular Indian right, policy or Treaty would be threatened by the enforcement of the offenses charged in the Indictment. See also, *United States v. Begay*, 42 F.3d 486, 499 (9th Cir.1994), cert. denied, — U.S. —, 116 S.Ct. 93, 133 L.Ed.2d 49 (1995), quoting *United States v. Burns*, 529 F.2d 114, 117 (9th Cir.1976) ("[F]ederal criminal statutes apply to Indians "unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question.").

**34.** In *United States v. Three Winchester 30–30 Caliber Lever Action Carbines*, 504 F.2d 1288 (7th Cir.1974), the Court held that a Federal law of general applicability applied to an Indian on a Reservation within the scope of Public Law 280.

The Defendant relied upon an 1854 Treaty in arguing that he was exempted from the operation of the Federal felon-in-possession law. In rejecting this argument, the Court stated: "In the present case federal criminal laws are involved and nothing in Public Law 280 or any other law precludes their application to Menominee Indians." The precedential effect of *Three Winchester* is limited, however, because the Court did not address the language in Public Law 280 upon which the Defendants rely; namely, that the listed States "have exclusive jurisdiction." *Title 18 U.S.C. § 1162(c).*

**35.** Public Law 280 expressly exempted several Reservations, within one of the listed States, from that State's jurisdiction because those Reservations had legal systems and organizations "functioning in a reasonably satisfactory manner." See, *S.Rep. No. 699*, cited in Goldberg, "Public Law 280: The Limits of State Jurisdiction over Reservation Indians," 22 *U.C.L.A.L.Rev.* 535, 542 (1975).

**36.** Act of Aug. 15, 1953, ch. 505, § 7, 67 Stat. 588 (codified, as amended, at Title 25 U.S.C. § 1321–1322).

eral crimes, as the States had no such authority to institute Federal charges elsewhere within their territorial limits. See, e.g., *Title 28 U.S.C. § 547(1)* (United States Attorney is the sole individual, in each of the respective Federal Districts, in whom Congress has vested the solemn obligation to institute Federal criminal proceedings).

Rather, in enacting Public Law 280, Congress was attempting to assimilate the Indians in Indian country within the criminal justice system of the respective, designated States. See, Frickey, "Marshalling Past and Present: Colonialism, Constitutionalism, and Interpretation in Federal Indian Law," 107 *Harv.L.Rev.* 381, 440 n. 205 ("Public Law 280 was adopted by the Congress with perhaps the strongest assimilationist views about federal Indian policy in modern times."). Accordingly, Public Law 280 expressly provided that the criminal laws of the designated State would "have the same force and effect within such Indian country as they have elsewhere within the State." *Title 18 U.S.C. § 1162(a).*

In addition, Public Law 280 contained the following proviso which is at the crux of the parties' dispute:

> (c) The provisions of sections 1152 and 1153 of this chapter shall not be applicable within the areas of Indian country listed in subsection (a) of this section as areas over which the several States have exclusive jurisdiction.[37]

*Title 18 U.S.C. § 1162(c).*

At some risk of oversimplification, the dispute before us revolves around the parties' respective interpretations of the term "exclusive," as that term is employed in Section 1162(c). The Defendants urge that, in using that term, Congress intended to completely divest all Federal criminal jurisdiction over the conduct of Indians within the affected Indian country. The Government counters that, in limiting its cession of jurisdiction to Sections 1152 and 1153, Congress made

known its intention that only the Federal Government's enclave jurisdiction, and its jurisdiction over a specific listing of major crimes, was being ceded to the designated States.

Both parties have identified decisional authorities which, arguably, are supportive of their preferred interpretations of Public Law 280. The Defendants place heavy weight upon the decisions in *United States v. Hoodie*, 588 F.2d 292 (9th Cir.1978) and *Anderson v. Gladden*, 293 F.2d 463 (9th Cir.1961), cert. denied, 368 U.S. 949, 82 S.Ct. 390, 7 L.Ed.2d 344 (1961), which they broadly read as endorsing their view that Public Law 280 displaced all Federal jurisdiction in the affected Indian country. We are not persuaded, however, that such an expansive reading is appropriate, for it glosses a critical distinction between those cases and the matter before us. While, admittedly, the Courts in both *Hoodie* and *Gladden* were addressing crimes that had occurred within Indian country designated by Public Law 280, those offenses were not Federal crimes of general applicability.[38] As the Defendants concede, neither case is dispositive of the issue before us.

In turn, the Government has relied upon those decisions, which we have previously referenced, and which have held that Federal crimes of general applicability apply with equal force to Indians in Indian country. With but one incidental exception, which we have previously identified, each of these cases addressed a crime that had occurred in areas outside of those designated in Public Law 280 and, therefore, their holdings are only of peripheral interest.

While not a paragon of clarity, our reading of Section 1162(c), particularly in conjunction with Section 1162(a), does not reveal an ambiguity which, to our mind, leaves the provision unintelligible. See, *Bryan v. Itasca County*, 426 U.S. 373, 392, 96

---

37. The phrase "as areas over which the several states have exclusive jurisdiction," was added to subsection (c) in 1970. This amendment appears to have been intended as a clarification of Congress's original intent. See, *116 Cong.Rec. 37,353* (1970) ("The additional language is descriptive only, and is not meant to change the meaning of 1162(c).").

38. In *Hoodie,* the jurisdictional issue arose in the context of a burglary prosecution, under the Major Crimes Act; whereas, in *Gladden*, an Indian, on a Reservation designated in Public Law 280, sought to vacate his State murder conviction.

S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976) (observing that certain provisions of Public Law 280, other than Section 1162(c), were "admittedly ambiguous"). Given Congress's express recognition that only those laws, which the State could enforce outside of affected Indian country, would be applicable to crimes committed in Indian country, we have no difficulty in reading the term "exclusive," as denoting Congress's intention that State law, rather than the provisions of Sections 1152 and 1153, would govern those specific types of criminal offenses. Since the States have not been vested, by Public Law 280 or otherwise, with any authority to institute Federal criminal charges, either within or without Indian country, Congress's employment of the term "exclusive" could not have envisioned any exclusivity in the State's jurisdiction over such Federal crimes.

▆▆▆ This interpretation of Section 1162(c) is corroborated by the available legislative history which underlies that Section's enactment. In this endeavor, we are obligated "to interpret the words of th[e] statut[e] in light of the purposes Congress sought to serve." *In re Windsor on the River Associates, Ltd.*, 7 F.3d 127, 130 (8th Cir.1993), citing *Norfolk Redevelopment & Housing Authority v. Chesapeake & Potomac Tel. Co.*, 464 U.S. 30, 36, 104 S.Ct. 304, 307, 78 L.Ed.2d 29 (1983). The available legislative history informs us that, in promulgating Public Law 280, Congress was intending to alleviate a perceived lawlessness on certain Indian Reservations. As expressed by the Supreme Court, in *Bryan v. Itasca County*, supra at 379, 96 S.Ct. at 2106:

> The primary concern of Congress in enacting Pub.L. 280 that emerges from its sparse legislative history was with the problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement.

To combat the lawlessness, which was apparently bred by the absence of a readily available body of site-specific criminal law, Congress sought to invoke State jurisdiction in the designated areas of Indian Country, and to make that same jurisdiction available to other interested States. In our view, the most plausible interpretation of Section 1162(c), given this expression of legislative purpose, substantiates the construction of that Section that is urged by the Government.

We do not believe that a Congress, which was concerned with lawlessness on Indian Reservations, would have intended to immunize those Indians, who were located on affected Indian country, from the enforcement of generally applicable Federal laws—laws that the States were not empowered to enforce. See, *American Paper Institute, Inc. v. American Electric Power Service Corp.*, 461 U.S. 402, 421, 103 S.Ct. 1921, 1932, 76 L.Ed.2d 22 (1983) (the Court should not "imput[e] to Congress a purpose to paralyze with one hand what it sought to promote with the other"). Were we to adopt the interpretation fostered by the Defendants, we would be obliged to find that Congress intended to quell lawlessness, in affected Indian country, by exempting the Indians within that country from the enforcement of distinctly and peculiarly Federal criminal laws. We decline to adopt such a strained statutory reading—a reading that would eradicate the clear purposes of Public Law 280. See, *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985) ("elementary canon of construction" that statute should be read so as not to render one provision redundant); *Darling v. Bowen*, 878 F.2d 1069, 1076 (8th Cir.1989) (interpretation must seek to adopt a construction that gives effect to all provisions), cert. denied, 494 U.S. 1066, 110 S.Ct. 1782, 108 L.Ed.2d 783 (1990); *Beef Nebraska, Inc. v. United States*, 807 F.2d 712 (8th Cir.1986) (same).

We find this construction of Section 1162(c) to also comport with the assimilationist goals of Congress, that were being pursued by the adoption of Public Law 280. Given this policy of integration, that was the backdrop of the Public Law's enactment, we believe that Congress could not have intended to divest Indians, in affected Indian country, from the protections of the generally applicable Federal criminal laws [39] when, in that same en-

---

39. While not determinative of the issues before us, we should not lose sight of the fact that the

actment, the affected Indians were benefiting from a State Court jurisdiction, as to situs-specific offenses, which was identical to that available to non-Indian residents of the same State. Notably, the Defendants are silent in advancing any rationale for their stated belief that Congress somehow intended to free affected Indian populations from the enforcement of Federal criminal violations, even as to those offenses which did not constitute a crime under State law.

The closest that the Defendants approach such a rationalization is in their comparison of Public Law 280 to a series of enactments, that conferred partial jurisdiction over Indian matters, upon certain, specific States, prior to the enactment of Public Law 280. Beginning in 1940, Congress conferred jurisdiction upon the State of Kansas over all Indian Reservations within the State. The pertinent Statute provided as follows:

> Jurisdiction is conferred on the State of Kansas over offenses committed by or against Indians on Indian reservations, including trust or restricted allotments, within the State of Kansas, to the same extent as its courts have jurisdiction over offenses committed elsewhere within the State in accordance with the laws of the State.

> This section shall not deprive the courts of the United States of jurisdiction over offenses defined by the laws of the United States committed by or against Indians on Indian reservations.

Act of June 8, 1940, ch. 276, 54 Stat. 249, codified at Title 18 U.S.C. § 3243.

Similarly worded statutes, that were enacted in 1946 and 1948, provided North Dakota, and then Iowa, with partial jurisdiction over specific Indian Reservations within their respective boundaries.[40] As the Defendants are quick to note, in contrast to Public Law 280, each of these statutes expressly noted that the delegation of jurisdiction to the affected State would not "deprive" Federal Courts of their "jurisdiction over offenses defined by the laws of the United States." In *Negonsott v. Samuels*, supra at 103, 113 S.Ct. at 1122, the Supreme Court construed this proviso as allowing the Federal Courts to retain their jurisdiction to try offenses subject to Federal jurisdiction under Sections 1152 and 1153, while permitting the State Courts of Kansas to try persons for the same conduct as it should be violative of State law.

The Defendants urge that, by omitting the same proviso from the language of Public Law 280, Congress clearly intimated its intention of depriving the Federal Government of all jurisdiction over crimes committed in affected Indian country. We find the inference, which the Defendants ask us to draw, and which is wholly premised upon Congress's silence, to be a most unconvincing negative pregnant.[41] See, *Fairview Deaconess Hosp. v. Heckler,* 749 F.2d 1256, 1259 n. 4 (8th Cir.1984) (characterizing an analogous argument from legislative history as "a rather weak negative pregnant"). Where, as here, there can be no legitimate contention that the various statutory provisions were *in pari materia,* such that their respective components might be considered interchangeably, we think that the wiser course requires that we consider what Congress said as opposed to what it left unsaid. See, *Duncan v. Louisiana,* 391 U.S. 145, 165, 88 S.Ct. 1444,

---

generally applicable Federal criminal laws have both a protective and a corrective aspect. For those accused of violating those statutes, the corrective or punitive component of the law is, no doubt, foremost in mind. Nevertheless, if the generally applied Federal criminal laws are found to be inapplicable to those inhabiting the Indian country, that has been designated in Public Law 280, then a sizable portion of the Indian population will lose the protections assured through the enforcement of those generally applied Federal laws.

**40.** See, Act of May 31, 1946, ch. 279, 60 Stat. 229, and Act of June 30, 1948, ch. 759, 62 Stat. 1161.

**41.** Our reluctance to read much into Congressional silence may best be illustrated by an analogy we draw from the physical sciences. As so analogized, the Defendants would appear to argue that, if the proverbial, unattended tree should fall in a forest, not only would a noise be produced, but the lexical derivation and syntax of that noise could also be intelligibly discerned. We are not persuaded that the silence of Congress, upon which the Defendants have premised their argument, is as expansive and articulate as they portend.

1455, 20 L.Ed.2d 491 (1968) (Black, J., concurring) (disparaging the kind of negative pregnant that relies on what was not said in the legislative process, since it is "far wiser to rely on what was said").

We are satisfied that, had it been Congress's intent to deprive the Federal Government of all criminal jurisdiction over the Indian country designated in Public Law 280, the drafters of Section 1162(c) would not have limited the withdrawal of such jurisdiction solely to Sections 1152 and 1153. Undoubtedly, if Congress had been of a mind to do so, Section 1162(c) would have contained the provision, which the Defendants urge us to legislate through judicial construction, that Sections 1152, 1153, and all generally applicable Federal criminal laws, would not be applicable in the designated areas of the Indian country. In short, the interpretation that the Defendants request is as implausible as it is unreasonable. See, generally, *American Tobacco Co. v. Patterson*, 456 U.S. 63, 71, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982) (statutes should be interpreted to avoid unreasonable results whenever possible).

■ Therefore, we conclude that the Government's interpretation of Section 1162(c) provides a sound and logical construction of its meaning. To illustrate this point, we use a charge of Federal income tax evasion as but one example. There would appear to be no dispute that, absent an express exemption in a Statute or Treaty, Indians are subject to the Federal income tax. *Choteau v. Burnet*, 283 U.S. 691, 51 S.Ct. 598, 75 L.Ed. 1353 (1931); *United States v. Brown*, 824 F.Supp. 124 (S.D.Ohio 1993). Under the Defendants' interpretation, an Indian who resides on a Reservation designated in Public Law 280, but who works outside that Reservation, would not be subject to prosecution for his willfully fraudulent completion of his Federal income tax return, so long as he prepared that return at his personal residence, and deposited the return in a Post Office box on the Reservation. Nonetheless, were the same conduct committed outside the boundaries of the Reservation, we suspect that even the Defendants would acknowledge that the Federal authorities would have jurisdiction to prosecute the matter. We find nothing in the Record before us, nor in the legal authorities that we have reviewed, which would suggest that Congress intended to distinguish between Indians residing on Reservations, which have legal systems "functioning in a reasonably satisfactory manner" and, therefore, excluded from Public Law 280's application, from those Indians who fall within Public Law 280's purview. Accordingly, we reject the Defendants' reading of Public Law 280.

■ Lastly, the Defendants contend that, in enacting Public Law 280, Congress vested complete and exclusive jurisdiction in the State of Minnesota to prosecute crimes of theft committed by Indians within Indian country. The Defendants note that, at the time Congress enacted Public Law 280, Section 1153 included the offense of "larceny," which has since been replaced by "a felony under § 661"—the general Federal theft statute. As such, the argument continues, the application of Section 1163, which prohibits the theft of funds from an ITO, to Indians within a designated Reservation, would effectuate, by implication, a repeal of Public Law 280.

We find, however, that the prosecution of the Defendants under Section 1163 does not effect any repeal of Section 1162. In enacting Public Law 280, Congress did not intend to divest the Federal authorities of all jurisdiction over crimes involving a theft, but only those crimes of theft in which the situs of the offense was an element of the crime. Of course, Section 1163 is not situs-restricted. See, *United States v. McGrady*, supra at 16 (Section 1163 makes certain actions criminal regardless of where they are committed). Moreover, having been enacted three years after the passage of Public Law 280, Congress anticipated that Section 1163 would be applied, most frequently, to Indians. See, *United States v. Markiewicz*, 978 F.2d 786, 800 (2d Cir.1992), cert. denied, 506 U.S. 1086, 113 S.Ct. 1065, 122 L.Ed.2d 369 (1993) (by referring to an Officer of an ITO, "Congress signaled its intent to confer federal-court jurisdiction over Indians committing this offense, because those most likely to commit the offense would be Indians"). In *Markiewicz*, the Court relied upon that portion of

Section 1163's legislative history which explained that "[t]he principal objective of the proposed bill is to protect Indian tribal organizations * * * from the actions of dishonest or corrupt tribal officials," and there is not the slightest suggestion that the Section was restricted to Reservations outside of those designated in Public Law 280. *United States v. Markiewicz,* supra, quoting S.Rep. No. 2723, 84th Cong., 2d Sess. (1956), reprinted in 1956 U.S.C.C.A.N. 2841, 3841–42.

In sum, therefore, we find that the Government's construction of Public Law 280 is reasonable, and consistent with the language of the Statute, and with its underlying purpose and history. Accordingly, we recommend that the Defendants' Motion to Dismiss on jurisdictional grounds be denied.

2. *The Motion To Dismiss And/Or Strike All References To Actions To Defraud The State Of Minnesota Of Sales Tax.*

The Defendants move to dismiss one Count of the Indictment, and to strike all other references, which relate to an alleged scheme to defraud the State of Minnesota of sales taxes. As noted, Count One of the Indictment alleges a conspiracy whose object, in part, was to defraud the State of Minnesota of sales tax revenues. In this respect, the Count describes the following overt acts:

1. On November 5, 1987, Finn purchased a truck with proceeds from his personal Bank account and the trade-in value of a truck he previously acquired with RRM, Inc. funds. According to a stipulation entered into among the parties, the retailer was not located on the Reservation. Finn registered the vehicle with RRM, Inc., and did not pay sales tax.

2. On May 5, 1987, Finn purchased a 1987 20–foot boat with an RBC purchase order on which, without authority, he had signed the name of the RBC controller. Finn attached to the purchase order a letter from the Minnesota Department of Revenue exempting RBC purchases from Minnesota sales tax. The transaction occurred on the Reservation. Finn then issued a check drawn from RRM, Inc., to pay for the boat. Finn subsequently sold the boat and deposited the proceeds in the estate of his former law partner.

3. On June 27, 1987, Finn purchased a 1987 16–foot boat in the name of the RBC with a check drawn from RRM, Inc. The retailer, according to the parties' stipulation, was located off of the Reservation, and no sales tax was paid. According to the Indictment, Finn treated the boat as his own property.

4. On June 13, 1990, Finn purchased a 1990 21–foot boat, on which no sales tax was paid, from a retailer located on the Reservation. At Finn's request, the controller had previously provided Finn with an RBC purchase order and a check drawn from RBC funds. (The RBC check was in the same amount as a check Finn had issued to the RBC drawn from RRM, Inc.) According to the Indictment, Finn operated the boat as his own property.

In addition, the background section to Counts 20 through 22 alleges that the Defendants participated in a mail fraud scheme. Pursuant to this alleged scheme, the Defendants are said to have intended to defraud the State of sales taxes that were due upon the sale of referenced boats "by means of false and fraudulent pretenses, representations and concealment of material facts." In particular, Count 20 asserts that the Defendants caused the retailer of one of the boats to file a false sales tax return.

The Government stresses that Finn did not, at the time of the referenced purchases, take the position he advances here; namely, that, as an Indian, he was not subject to the State sales tax. The Government contends that, instead, Finn misled the retailers into believing that he was purchasing the watercraft on behalf of the RBC. In this respect, the Indictment alleges, and the Defendants do not dispute, that Finn treated the boats, or the proceeds from their sale, for personal purposes. The parties have not addressed the tax consequences that would attend Finn's purchase of the boats on behalf of the RBC, as the Defendants argue that, because Finn is a Native American, the State had no authority to impose its sales tax upon any of the referenced transactions. While innovative, we reject the Defendants' argument as unsound.

a. *Standard of Review.* Rule 12(b), Federal Rules of Criminal Procedure, allows our consideration at this pretrial stage, of any defense "which is capable of determination without the trial of the general issue." To withstand a Motion to Dismiss, an Indictment must allege that the Defendant performed acts which, if proven, would constitute a violation of the law for which he has been charged. *United States v. Polychron,* 841 F.2d 833, 834 (8th Cir.1988), cert. denied, 488 U.S. 851, 109 S.Ct. 135, 102 L.Ed.2d 107 (1988). As a result, if the acts, that have been alleged in the Indictment, do not constitute a criminal offense, then the Indictment should be dismissed. See, e.g., *United States v. Coia,* 719 F.2d 1120, 1123 (11th Cir.1983), cert. denied, 466 U.S. 973, 104 S.Ct. 2349, 80 L.Ed.2d 822 (1984).

b. *Legal Analysis.* As noted, the Defendants contend that the State of Minnesota has no authority to levy a sales tax upon the transactions recited in the Indictment and, therefore, as a matter of law, the Defendants' failure to pay sales taxes on those transactions cannot support a criminal charge. For this proposition, the Defendants rely upon the general rule that, absent congressional consent, States have no jurisdiction to impose State taxes on Indians for transactions which have occurred on a Reservation. *McClanahan v. State Tax Commission of Arizona,* 411 U.S. 164, 170, 93 S.Ct. 1257, 1261, 36 L.Ed.2d 129 (1973) (absent cession of jurisdiction or other Federal statutes, there is no authority for taxing Indian income from activities carried on within the boundaries of a Reservation); *Bryan v. Itasca County,* supra (Public Law 280 did not grant States the authority to impose taxes on Reservation Indians.).

The Defendants further rely upon *Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), where the Supreme Court rejected an attempt by the State of Montana to levy cigarette sales taxes, and personal property taxes, on Reservation Indians. The Court found no basis for distinguishing *McClanahan v. State Tax Commission of Arizona,* supra, which had rejected the State's contention that the tribal members were so completely integrated with non-Indian residents that there was no reason to accord them a different tax treatment.

Tribal immunity notwithstanding, the Court, in *Moe,* approved the State's "requirement that the Indian tribal seller collect a tax validly imposed on non-Indians" as a "minimal burden designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller w[ould] avoid payment of a concededly lawful tax." *Id.* at 483, 96 S.Ct. at 1646. The Supreme Court reiterated this view in *Oklahoma Tax Commission v. Potawatomi Indian Tribe,* 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), and ruled that a tribe's sovereign immunity did not deprive the State of Oklahoma of the authority to tax cigarette sales to non-Indians on a Reservation. The Court further concluded that the tribe had an obligation to assist in the collection of that tax. In response to concerns, that its decision provided a right without a remedy, the Court noted that "the States may enter into agreements with the tribes to adopt a mutually satisfactory regime for the collection of this sort of tax." *Id.* at 514, 111 S.Ct. at 912.

The Government contends that such an agreement has existed between the State and the Leech Lake Band, and that the effect of the Agreement has been to authorize the State to levy and collect its sales tax on the purchases referenced in that agreement.[42] In this respect, the Minnesota Legislature, in 1977, authorized the Commissioner of Reve-

---

42. In what appears to be an alternative argument, the Government correctly asserts that two of the transactions—the purchases of the truck and of the 1987 16-foot boat—occurred off of the Reservation. At the Hearing, the Defendants urged that the State of Minnesota not only lacked the authority to tax Reservation Indians for on-Reservation purchases, but also for off-Reservation purchases where the goods were to be delivered to the Reservation. Whatever may be the underlying merits of the on-Reservation versus off-Reservation dichotomy, there is no indication in the Record whether the truck or the boat in question were delivered to the Reservation. In any event, we need not address what appears to be a fact issue, in light of our finding that, regardless of where the sales transactions occurred, Finn was required to pay the sales tax on all of the transactions that have been alleged in the Indictment.

nue to enter into refund agreements with tribal governments. *Minnesota Statutes Section 270.60.*[43] In adopting this statutory measure, we suspect the Minnesota Legislature might have been motivated by some concern that, without such a provision, Reservation Indian could market their exemption from State taxation to non-Indians, who would normally conduct their business elsewhere. See, *Dept. of Taxation & Finance v. Milhelm Attea & Bros., Inc.,* ––– U.S. –––, –––, 114 S.Ct. 2028, 2035, 129 L.Ed.2d 52 (1994), quoting *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 155, 100 S.Ct. 2069, 2082, 65 L.Ed.2d 10 (1980).

Pursuant to this statutory mechanism, on March 6, 1978, White and Pemberton, who were acting on behalf of the Leech Lake Band, and the Minnesota Commissioner of Revenue, executed an Agreement entitled: "Agreement Relating to the Refundment of Sales and Use Taxes and Motor Vehicle Excise Taxes." By this Agreement, the State of Minnesota was permitted to collect and enforce sales, use and motor vehicle taxes on all sales made on the Reservation. Recognizing that the State "ha[d] no jurisdiction to impose state taxes on Indians on transactions occurring on the Indian reservations," the Agreement obligated the State to refund, to the Leech Lake Band, a per capita sum of money.

We find the Agreement to be remarkably consistent with the Supreme Court's response to Oklahoma's tax collection concerns, in *Oklahoma Tax Commission* case, that a State and Indian tribe may agree to a mutually satisfactory regime for the collection of taxes. As but one example, a provision of the Agreement reflects both parties interest "in establishing a fair and convenient method" for tax collection and subsequent refundment.

The Defendants contend, however, that, notwithstanding the Agreement, neither the State nor the Band had the authority to subject individual Indians to liability for State taxes on Reservation purchases. We find this argument to misconstrue the nature of tribal sovereign immunity. Under any considered view of the doctrine, tribal sovereign immunity would not prevent the State of Minnesota from enforcing the Agreement reached with the Leech Lake Band, for sovereign immunity attaches to a tribe because of its status as a dependent, domestic nation. See, *United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978) (tribes possess those aspects of sovereignty "not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status"). More particularly, tribal immunity does not extend to the individual members of the tribe. *Puyallup Tribe v. Department of Game of Washington,* 433 U.S. 165, 173, 97 S.Ct. 2616, 2621, 53 L.Ed.2d 667 (1977) (assertion of tribal sovereign immunity does not impair authority of State Court to adjudicate rights of tribal members); *United States v. James,* 980 F.2d 1314, 1319 (9th Cir.1992), cert. denied, ––– U.S. –––, 114 S.Ct. 119, 126 L.Ed.2d 84 (1993); *United States v. State of Oregon,* 657 F.2d 1009, 1012 n. 8 (9th Cir.1981).

Under the doctrine espoused in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908),[44] moreover, tribal immunity

---

**43.** At the time of the transactions referenced in the Indictment, Minnesota Statute Section 270.60, which is entitled "Tax refund agreements with Indians," read as follows:

Subdivision 1. Taxes paid by Indians. The commissioner of revenue is authorized to enter into a tax refund agreement with the governing body of any Sioux or Chippewa reservation in Minnesota. The agreement may provide for a mutually agreed upon amount as a refund to the governing body of any sales or excise tax paid by the Indian residents of a reservation into the state treasury, or for an amount which measures the economic value of an agreement by the council to pay the equivalent of the state sales tax on items included in the sales tax base but exempt on the reservation, notwithstanding any other law which limits the refundment of taxes. * * *.

&ast; &ast; &ast; &ast; &ast;

Subdivision 2. Appropriation. There is annually appropriated from the general fund to the commissioner of revenue the amounts necessary to make the refund provided in this section.

**44.** In *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court held that a suit challenging an individual in his official governmental capacity—claiming that the individual was acting outside of his authority—was not a suit against the sovereign.

does not preclude actions against tribal officials, when they are acting outside of their authority. See, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978) (as an officer of the tribe, the petitioner was not protected by the tribe's immunity from suit); *Northern States Power Co. v. Prairie Island Mdewakanton Sioux Indian Community*, 991 F.2d 458, 460 (8th Cir.1993) (*"Ex parte Young* applies to the sovereign im-munity of Indian tribes, just as it does to state sovereign immunity."). Of special relevance, however, is the fact that the Supreme Court, in the *Oklahoma Tax Commission* case, relied upon the doctrine in *Ex parte Young* to conclude that, in enforcing its right to collect taxes on Reservation sales, Oklahoma was not precluded from commencing an action for damages against the tribal agents or officers.

▮ Based upon these authorities, we conclude that the referenced tax Agreement foreclosed the Defendants' ability to invoke the protection of sovereign immunity as a defense against the enforcement of the State sales tax laws. If the acts alleged in the Indictment are proven, the Defendants clearly acted outside their capacity as tribal officers if they caused false sales tax returns to be filed, as the Indictment alleges.

Nor is our view changed by the Defendants' assertion that nothing in the Agreement reflects that the Leech Lake Band authorized the State to levy its taxes upon Band members. The Agreement specifically provides that the State sales tax "will be imposed on all sales made on the reservation * * *[,] shall be collected and remitted by all vendors on the reservation * * *[,] and shall be subject to the same penalties, interest, and enforcement provisions [as provided in the State Sales Tax Act]." Moreover, the Agreement specifically contemplates a method of refunding "taxes collected on sales to Leech Lake Band Indians occurring on the Indian reservation."

As a consequence, we conclude that, if the alleged acts are proven at Trial, the Defendants unlawfully deprived the State of Minnesota of certain sales tax revenues to which the State was entitled. Therefore, we recommend that the Defendants' Motion to Dismiss Count 20, and to strike all references, in the Indictment, to the Defendants' attempts to defraud the State of its sales tax revenues, should be denied.

3. *The Motion For The Suppression Of Physical Evidence And Statements.*

The Defendants, with the exception of Brown, seek to suppress all physical evidence that relates to the alleged money laundering offenses, which are described in Counts 15 through 19 of the Indictment. Specifically, the Defendants maintain that the evidence was obtained by an individual who lacked investigatorial authority. Since the materials in question were secured through the issuance of a Grand Jury subpoena, we find this Motion to be without merit.

▮ a. *Standard of Review.* The main function of a Grand Jury is to determine whether probable cause exists to believe that a crime has been committed. *Branzburg v. Hayes*, 408 U.S. 665, 686–87, 92 S.Ct. 2646, 2659–60, 33 L.Ed.2d 626 (1972). In order to properly serve this function, the Grand Jury possesses broad investigative powers. See, *United States v. Calandra*, 414 U.S. 338, 344, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974) ("The grand jury's investigative power must be broad if its public responsibility is adequately to be discharged.") Although the Fourth Amendment prohibits searches that are "unreasonable," *U.S. Const. Amend. IV*, many of the rules and restrictions that apply at a Trial do not apply to Grand Jury proceedings. Thus, a Grand Jury "may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials." *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 298, 111 S.Ct. 722, 726, 112 L.Ed.2d 795 (1991) quoting *United States v. Calandra*, supra at 343, 94 S.Ct. at 617. We apply this focus to our analysis of the Defendants' Motion to Suppress.

b. *Legal Analysis.* The Defendants claim that the agent who obtained the physical evidence, which relates to the charges of money laundering, investigated without authority. In support of their position, they

cite Title 18 U.S.C. § 1957(e), which provides:

> Violations of this section may be investigated by such components of the Department of Justice as the Attorney General may direct, and by such components of the Department of the Treasury as the Secretary of the Treasury may direct, as appropriate and, with respect to offenses over which the United States Postal Service has jurisdiction, by the Postal Service. Such authority of the Secretary of the Treasury and the Postal Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury, the Postal Service, and the Attorney General.

The Defendants assert that an agent with the Department of Interior conducted the Government's investigation into the alleged money laundering and that, because that investigator was not an agent of the Department of the Treasury, the Department of Justice, or the Postal Service, his investigation was *ultra vires*, and all of the information that he secured should be suppressed.

In response, the Government concedes that the funds, which are referenced in the money laundering Counts, were the subject of an investigation by an agent with the Department of the Interior. According to the Government, this investigation related to the agent's coextensive investigation into the allegations of conspiracy, theft, misapplication of funds and mail fraud. The Government contends, however, and the Defendants do not dispute, that the evidence which the Defendants' seek to suppress was obtained through the execution of a Grand Jury Subpoena.[45]

 Nonetheless, the Defendants' urge that we disregard the existence of the Grand Jury investigation for, in their view, the evidence was illegally obtained simply because it was not gathered by an agent of the governmental agencies listed in Section 1957(e). In deciding whether to suppress evidence, that has been secured through the execution of a Grand Jury subpoena, we are guided by the Supreme Court's recent observations in *United States v. R. Enterprises, Inc.*, supra:

> The function of the grand jury is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred. As a necessary consequence of its investigatory function, the grand jury paints with a broad brush. * * * A grand jury subpoena is thus much different from a subpoena issued in the context of a prospective criminal trial.

Whatever limits Section 1957(e) may place upon criminal investigations outside the context of a Grand Jury investigation, we conclude that the Grand Jury, in the conduct of its investigations in this case, acted well within its broad grant of investigatory authority when it garnered the evidence which, purportedly, relates to the money laundering charges. See, *Matter of Grand Jury Investigation*, 922 F.2d 1266, 1269 (6th Cir.1991) (Grand Jury is "vested with broad subpoena powers not otherwise permitted outside the grand jury context"). We find nothing in Section 1957(e), nor have the Defendants drawn any legal authority to our attention, that outweighs the historic, venerated, and expansive investigatory powers of the Grand Jury.

In the final analysis, we are loathe to fetter the Grand Jury in its investigatory functions. Finding no basis to conclude that the evidence in question was unreasonably searched or seized, we recommend that the Motion to Suppress be denied.[46]

### 4. *The Motions to Dismiss Various Counts of the Indictment.*

One or more of the Defendants have moved to dismiss certain Counts of the In-

---

**45.** The Government further avers that an agent with the Internal Revenue Service was assigned to the money laundering portion of this case and, consistent with that assignment, he analyzed the evidence which pertained to the asserted money laundering charges.

**46.** At the Hearing, Brown and Pemberton each withdrew their related Motions to suppress any statements or physical evidence. As noted, however, Pemberton joined in the Motion of Finn to suppress the evidence of any money laundering, based upon the asserted lack of investigatory authority.

dictment but, for reasons which follow, we find no basis to grant the relief requested.

■ a. *Standard of Review.* A Motion for the dismissal of a Count in an Indictment may be brought at any time pursuant to Rule 12(b)(2), Federal Rules of Criminal Procedure. In reviewing the sufficiency of an Indictment, or of any of its Counts, we are to determine whether the Indictment sufficiently sets forth the elements of the offenses alleged, whether it places the Defendant on fair notice of the charges against him, and whether it enables the Defendant to assert an acquittal or conviction so as to invoke his privilege against double jeopardy for a single offense. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *United States v. Morris,* 18 F.3d 562 (8th Cir.1994); *United States v. Staggs,* 881 F.2d 1527, 1530 (10th Cir.1989), cert. denied, 493 U.S. 1020, 110 S.Ct. 719, 107 L.Ed.2d 739 (1990).

■ In determining whether an Indictment has sufficiently set forth the elements of the offense charged, the Indictment will generally be deemed sufficient "unless no reasonable construction can be said to charge the offense." *United States v. Morris,* supra at 568, quoting *United States v. Peterson,* 867 F.2d 1110, 1114 (8th Cir.1989). In making this assessment, we must accept the allegations of the Indictment as true. *United States v. Barker Steel Co., Inc.,* 985 F.2d 1123, 1125 (1st Cir.1993); *United States v. Cadillac Overall Supply Co.,* 568 F.2d 1078, 1082 (5th Cir.1978), cert. denied, 437 U.S. 903, 98 S.Ct. 3088, 57 L.Ed.2d 1133 (1978). Ordinarily, the Court's assessment is limited to the "four corners" of the Indictment, and the Court should studiously avoid the consideration of evidence from sources beyond the Indictment. *United States v. Hall,* 20 F.3d 1084, 1087 (10th Cir.1994). However, it is permissible, and even desirable in certain circumstances, for the Court to examine the factual predicates of an Indictment, particularly where material facts are undisputed, in order for the Court to ascertain whether the elements of the criminal charge can be shown. *Id.; United States v. Brown,* 925 F.2d 1301 (10th Cir.1991).

b. *Legal Analysis.* Given this Standard of Review, we examine each of the Defendants' remaining Motions to Dismiss.

### 1) *The Motion to Dismiss Counts 2 through 9 and 26.*

Finn moves to dismiss Counts 2 through 9 and 26, and Pemberton moves to dismiss Count 5, on the grounds that these Counts fail to state a crime, and are duplicitous. These Counts assert that the Defendants "did knowingly and intentionally" steal money and property, which belonged to the Leech Lake Band and "its tribal Corporation, Reservation Risk Management," and which had been entrusted to their care as officers or agents of the Band, in violation of Title 18 U.S.C. § 1163.[47] Each of the referenced Counts alleges a different theft or misappropriation.

■ In response to this Motion, the Government correctly points out that, at this pretrial stage, the Indictment should be tested solely by its sufficiency in charging an offense, irrespective of the strength or weakness of the Government's case. See, *United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *United States v. King,* 581 F.2d 800, 802 (10th Cir.1978). Accordingly, the Government strongly encourages us not to look beneath the facial allegations of the Indictment in order to determine if the

---

47. Title 18 U.S.C. § 1163 provides:
Whoever embezzles, steals, knowingly converts to his use or the use of another, willfully misapplies, or willfully permits to be misapplied, any of the moneys, funds, credits, goods, assets, or other property belonging to any Indian tribal organization or entrusted to the custody or care of any officer, employee, or agent of an Indian tribal organization;

\* \* \* \* \* \*

Shall be fined under this title, or imprisoned not more than five years, or both \* \* \*.

As used in this section, the term "Indian tribal organization" means any tribe, band, or community of Indians which is subject to the laws of the United States relating to Indian affairs or any corporation, association, or group which is organized under any of such laws.

objectionable allegations are supported by substantial evidence. *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956).[48]

The Defendants rely upon *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448 (9th Cir.1986), cert. denied, 478 U.S. 1007, 106 S.Ct. 3301, 92 L.Ed.2d 715 (1986), in which the Court recognized that questions of fact may be determined by pretrial motion "so long as the court's findings do not invade the province of the ultimate finder of fact" and where the "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *Id.*, at 1452 [internal citations omitted]. Nevertheless, even there, the Court concluded that the Trial Court had appropriately deferred the issue, for the consideration of the Jury, because the evidence pertaining to the pretrial Motion was not "entirely segregable" from the evidence to be adduced at Trial. *Id.*, at 1453. Here, we decline any invitation to assess the weight of the anticipated evidence at Trial, and we assess the sufficiency of the challenged Counts upon the face of the Indictment's allegations, and we turn to the merits of the Defendants' Motion.

For dismissal, the Defendants raise two principal arguments. First, they urge that no tribal funds were stolen. In support of this claim, the Defendants argue that the monies at issue did not belong to the Band at the time of the alleged offenses. Moreover, because RRM, Inc. was not an ITO, they contend that a theft from that corporation cannot support a violation of Section 1163. Second, the Defendants contend that Finn was not an agent of the Band at the time of the alleged offenses.

In asserting that, as a matter of law, RRM, Inc., was not an ITO, the Defendants rely on our Court of Appeals' decision in *United States v. Zephier*, 916 F.2d 1368 (8th Cir. 1990). There, the Court held that, in determining whether an entity is an ITO under Section 1163, the "critical issue" is "whether a sufficient nexus exists between the corporation and an Indian tribe or tribes." *Id.*, at 1369, citing *United States v. White Horse*, 807 F.2d 1426, 1430 (8th Cir.1986). Similarly, in *White Horse*, the Court considered whether a corporate telephone authority, that had been chartered by an Indian tribe, constituted an ITO. In addressing that issue, the Court observed as follows:

> [T]he issue of whether the Telephone Authority was an [ITO] required an assessment of the probative value of the ordinance establishing the Telephone Authority, the testimony regarding the managerial control the Tribe exerted over the Telephone Authority, the testimony concerning their financial relationship, and various other evidence that may have tended to prove that a sufficient nexus existed between the Tribe and the Telephone Authority.

Understandably, the Court in *White Horse* was justifiably concerned that the defendant's right to have a Jury decide such issues of fact be properly preserved. As a consequence, the Court reversed the Trial Court's determination that the Telephone Authority was an ITO as a matter of law, and remanded the matter for an appropriate determination of an essential issue of fact.

 Given the record before us, we conclude that a determination as to whether RRM, Inc. was an ITO is an issue of fact well within the province of the Jury. While the

---

**48.** As noted, the Tenth Circuit has recognized an exception to this facially sufficient approach, when the underlying material facts are undisputed, and where the Government has failed to object to the Court's resort to evidence outside of allegations of the Indictment. See, *United States v. Brown*, 925 F.2d 1301 (10th Cir.1991). "Under this scenario, a pretrial dismissal is essentially a determination that, as a matter of law, the government is incapable of proving its case beyond a reasonable doubt." *United States v. Hall*, 20 F.3d 1084, 1088 (10th Cir.1994). This sce-

nario, however, is the rare exception. See, *United States v. Ailsworth*, 873 F.Supp. 1450, 1460 (Kan.1994) (Court found exception inapplicable where "government apparently does not concede that there are insufficient facts to support these charges, nor has the government offered to participate in a pretrial evidentiary hearing."). We understand the Government to be suggesting that it intends to proffer additional evidence of the Defendants' culpability at Trial and, therefore, we must reject, as premature, the Defendants' present effort to challenge the sufficiency of the Government's case.

Defendants place great reliance on their claim, that Finn controlled the majority of the stock ownership in RRM, Inc, the Indictment asserts that shares of stock were only issued in RRM, Inc., a corporation formed under Minnesota law. Of course, we understand the Defendants to contest the Indictment's assertion, by contending that RRM, Inc. was incorporated under both tribal and State law, but the resolution of such conflicting evidence remains a proper factfinding function of the Jury at Trial.[49]

Similarly, we conclude that whether the monies at issue were the property of the Band, at the time of the alleged offenses, is an unavoidably factual determination. To support their contention, the Defendants point to an insurance contract and to a shareholder agreement as evidence that the monies paid to RRM, Inc., belonged to that entity and not to the Band. As noted, Section 1163 makes an ITO's ownership of the property in question an essential element of the crime. However, inasmuch as the Defendants challenge the Government's ability to prove that the money belonged to the Band, we find the argument to be a premature challenge to the adequacy of the Government's ultimate proof. See, *United States v. Ayarza–Garcia*, 819 F.2d 1043, 1048 (11th Cir.1987) (the determination of the validity of a defense or any other question of fact is improper when considering a pretrial Motion to dismiss an Indictment), cert. denied, 484 U.S. 969, 108 S.Ct. 465, 98 L.Ed.2d 404 (1987).

For the same reason, we conclude that it would be inappropriate, at this stage in the proceedings, to resolve whether Finn acted as the Band's agent since, at its core, this is quintessentially a factual question. Of course, the Defendants' are not precluded from raising this defense, together with their contention that the tribal funds could not have been stolen from an ITO, at a later stage in the proceedings. Indeed, the accepted procedure, for properly raising a challenge to the sufficiency of the Government's proof, is by a Motion for Judgment of Acquittal under Rule 29, Federal Rules of Criminal Procedure. See, *United States v. Ayarza–Garcia*, supra.

In addition, the Defendants contend that Counts 2 through 9 and 26 are duplicitous. Duplicity involves the joining, in a single Count, of two or more distinct and separate offenses. *United States v. Street*, 66 F.3d 969, 974 (8th Cir.1995); *United States v. Wright*, 704 F.2d 420 (8th Cir.1983). "The principal vice of a duplicitous indictment is that the jury may convict a defendant without unanimous agreement on the defendant's guilt with respect to a particular offense." *United States v. Street*, supra, quoting *United States v. Karam*, 37 F.3d 1280, 1286 (8th Cir.1994), cert. denied, —— U.S. ——, 115 S.Ct. 1113, 130 L.Ed.2d 1077 (1995). Here, the Defendants argue that each of the challenged Counts impermissibly charges one offense as being three separate violations of Section 1163; namely, theft of property belonging to the Band, theft of property belonging to RRM, Inc., and theft of property entrusted to Finn as the Band's agent.[50] We disagree.

The focus of the duplicity inquiry is whether distinct and separate "offenses" are alleged in a single Count. See, *United*

---

49. The factual nature of the question whether an entity is an ITO is further demonstrated in the two-prong test set forth in *United States v. Zephier*, 916 F.2d 1368, 1372 (8th Cir.1990). Under that test, an entity is an ITO if it is subject to a tribe's control, and the entity conforms to or complies with Federal laws governing Indian affairs. In ascertaining whether the requisite control has been demonstrated, evidence on the extent, if at all, that the tribe played in the entity's establishment and continuity, the tribe's selection of the entity's members, and the tribe's, or its members' entitlement to the benefits of the organization's services, are all relevant considerations. *Id.* at 1376 n. 4.

50. Counts 2 through 9 and 26 each begin with identical language, as follows:

> On or about [a certain date], in the State and District of Minnesota, the defendant * * * did knowingly and intentionally embezzle * * * and willfully misapply * * * property belonging to a tribal organization, the Leech Lake Band of Chippewa Indians and its Tribal Corporation, Reservation Risk Management, Inc., and which had been entrusted to the custody and care of the defendant as an officer, employee, and agent of the Leech Lake Band of Chippewa Indians, to wit: [specified property is listed] * * *.

*States v. Correa–Ventura,* 6 F.3d 1070, 1081 n. 18 (5th Cir.1993). Where, as here, a statute describes two or more ways by which a single offense may be committed, Rule 7(c)(1), Federal Rules of Criminal Procedure, permits an allegation, in a single Count, that the Defendant committed an offense by one or more specified means.[51] See, *United States v. Street,* supra. Section 1163 defines a single crime and, each of the challenged Counts describes a separate transaction, or theft, which constitutes one offense under Section 1163. While there may be more than one piece of evidence to support each Count, or more than one way by which to commit the offense, that does not make the Count duplicitous. *United States v. Adler,* 623 F.2d 1287, 1290 (8th Cir.1980) (more than one piece of evidence supporting the Count does not make Count duplicitous). Since each Count alleges only one Section 1163 offense, we reject the Defendants' duplicity argument as without merit.

█ Lastly, Finn contends, without the benefit of case or logic, that Section 1163 is void for vagueness. The test applied to criminal laws, which are challenged as unconstitutionally vague, is whether "men of common intelligence must necessarily guess at its meaning and differ as to its application." *Planned Parenthood of Minnesota v. State of Minnesota,* 910 F.2d 479, 482 (8th Cir.1990), quoting *Baggett v. Bullitt,* 377 U.S. 360, 367, 84 S.Ct. 1316, 1320, 12 L.Ed.2d 377 (1964). The challenger " 'must demonstrate that the law is impermissibly vague in all of its applications,' and that the statute could never be applied in a valid manner." *Planned Parenthood of Minnesota v. State of Minnesota,* supra, quoting *Village of Hoffman Estates v.*

*Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362 (1982). Since no such show has been made, we reject Finn's vagueness challenge as meritless.

### 2) *The Motion to Dismiss Counts 10, 11, 13 and 14.*

Finn seeks to dismiss Counts 10, 11, 13 and 14, and Pemberton urges the dismissal of Count 13,[52] all of which charge that one or the other of these Defendants stole money and property belonging to the Leech Lake Band, in violation of Title 18 U.S.C. § 666 (theft from program receiving federal funds).[53] Finn contends that the Counts fail to state all of the essential elements of the stated offense, because each Count omits Finn's agency status with respect to the Band. In addition, because he believes that the money at issue did not belong to the Band, nor was it in the Band's control, Finn seeks a dismissal of the Counts for failing to state an offense under Section 666.

For his omission argument, Finn relies upon the Court's decision in *United States v. Camp,* 541 F.2d 737 (8th Cir.1976). There, the word "forcibly" was omitted from an Indictment returned under a statute which began: "Whoever forcibly assaults, resists, opposes * * *." See, *Title 18 U.S.C. § 111(a)(1).* The Court concluded that the omission required a reversal of a conviction because force was an essential element of the offense in question. Of particular concern to the Court in *Camp* was the Defendant's Fifth Amendment right to be tried upon charges that were returned by a Grand Jury. *Id.* at 740. Here, Finn argues that "agency" is an

**51.** In pertinent part, Rule 7(c)(1) provides:

It may be alleged in a single count that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means.

**52.** Pemberton was charged in Count 13 for the same offense, and he has joined Finn in the Motion to dismiss Counts 10, 11, 13 and 14.

**53.** In relevant part, Title 18 U.S.C. § 666 provides:

(a) Whoever, if the circumstances described in subsection (b) of this section exists—

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—
(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—
(i) is valued at $5,000 or more, and
(ii) is owned by, or is under the care, custody, or control of such organization, government, or agency;

 * * * * * *

shall be fined under this title, imprisoned not more than 10 years, or both.

essential element of a Section 666 offense and, therefore, the omission from the Indictment, of his status as an agent of the Band, should result in a dismissal of the Section 666 Counts.

 In determining whether an essential element of an offense has been omitted, a Court should not insist upon the presence of a particular word or phrase. *United States v. Camp*, supra. Here, the Government notes that the "Background" section of the Indictment adequately explains Finn's status as an agent of the tribe, since the section, which is expressly incorporated in every other Count in the Indictment, advises that Finn served as the Band's legal counsel from 1983 to June 1, 1990. In turn, Finn responds that the language does not permit a reasonable inference that he was the Band's agent at the time of the alleged thefts, as the Counts describe four separate thefts that assertedly took place during the period of June 13, 1990 through July 5, 1990.

Nevertheless, we conclude that the Indictment adequately describes Finn's status as the Band's agent. As noted, the Indictment relates that Finn acted as the Band's legal representative for seven years, ending on June 1, 1990. It reasonably follows that Finn may well have continued to act as the agent of the Band for some period of time after his formal representation terminated. The resolution of that factual dispute, however, is properly for the Jury, for our task at this stage in the proceedings is merely to determine whether the Indictment is sufficient in relating all of the essential elements of the charged offenses. When reasonably construed in other than a hypertechnical sense, we find the Counts at issue adequately and fairly set forth the elements of a Section 666 offense.

As to Finn's second contention, we may summarily reject his notion that the Counts should be dismissed because no tribal funds were taken, since we have previously characterized, we think quite properly, as an issue of fact for a Jury's resolution. Therefore,

the Motion to Dismiss Counts 10, 11, 13 and 14 should be denied.

3) *The Motion to Dismiss Count 12.*

Next, Finn and Pemberton move to dismiss Count 12 on the ground that it is duplicitous. Count 12 charges Finn with offering, and Pemberton with accepting, a bribe, in violation of Title 18 U.S.C. § 666.[54]

 As we have noted, duplicity is the melding, in a single Count, of two or more distinct and separate offenses. *United States v. Street*, supra. Here, the Defendants contend that Count 12 is duplicitous because it charges Finn with offering a bribe, and also charges Pemberton with accepting that bribe. As the Court in *Street* made clear, the prohibition against duplicitous pleading is designed to preclude a jury from convicting a Defendant, under a single Count that charges more than one offense, without agreeing, unanimously, on the Defendant's guilt of the same offense. Of course, such a result could not occur here, because the single Count has charged each of the Defendants with a single offense, rather than multiple offenses against a single Defendant. Cf., *United States v. Papia*, 399 F.Supp. 1381, 1386 (E.D.Wis.1975) (Counts were not duplicitous where they alleged a single act of violating two different sections of the criminal code and not the joining together in a single Count of several alleged offenses). Accordingly, we recommend that the Defendants' Motion to Dismiss Count 12 be denied.

4) *The Motion of Pemberton to Dismiss Count 19.*

Pemberton urges a dismissal of Count 19, which charges that he "did knowingly engage and attempt to engage in a monetary transaction[,] * * * such property having been derived from a specified unlawful activity," in violation of Title 18 U.S.C. § 1957. For dismissal, Pemberton asserts that Section 1957 is unconstitutional on its face; that the Count is multiplicitous; and that the charged predicate offense cannot form the basis for this Count.

---

**54.** Count 12 states, in pertinent part:

On or about June 25, 1990, in the State and District of Minnesota, the defendants [Finn

and Pemberton] did corruptly give and corruptly accept * * *.

Pemberton contends that Section 1957 is unconstitutional because it lacks a knowledge requirement. As noted, Section 1957 prohibits "knowingly engag[ing] in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity." *Title 18 U.S.C. § 1957(a)*. "Criminally derived property" is defined as "any property constituting, or derived from, proceeds obtained from a criminal offense." *Title 18 U.S.C. § 1957(f)(2)*. Thus, Section 1957 requires that the Defendant know that the property is "criminally derived," but the Section does not require that the Defendant know that the property was derived from a specific "specified unlawful activity." See, *United States v. Gabriele*, 63 F.3d 61, 65 (1st Cir.1995); *United States v. Baker*, 19 F.3d 605, 614 (11th Cir.1994) (to establish a Section 1957 offense, the Government must prove that the Defendant knew that the property was obtained from a criminal offense).

Pemberton does not dispute this point, for he states: "[T]he government is not required to prove that the accused knew that the property was derived from a specified unlawful activity—only that he knew the property was criminally derived." Accordingly, the case law he cites, which purports to require a knowledge element in criminal prosecutions, is inapposite. To the extent Pemberton challenges Section 1957 for omitting a knowledge requirement as to the "specified" unlawful activity, from which the property is derived, we reject that argument as unsound. We agree with the reasoning of the Court in *United States v. Gabriele*, supra, where a similar challenge to Section 1957 was characterized as "an attempt to second-guess the congressional decision to criminalize a particular type of knowing conduct." *Id.*, at 65. See also, *United States v. Baker*, supra (the Court rejected challenge that Section 1957, as applied to the Defendant, was unconstitutionally vague in light of its finding that Section 1957 "clearly proscribed" the Defendant's conduct). We find no basis to conclude that Section 1957 is facially invalid.

Pemberton next contends that Section 1957(c) is impermissibly multiplici-

tous. "Multiplicity" refers to the charging of a single offense in several Counts. *United States v. Dixon*, 921 F.2d 194, 196 (8th Cir. 1990). "The vice of this practice is that multiple sentences may result" and, "[l]ikewise it may suggest to the jury that the defendant committed more than one crime." *Id.*, citing *United States v. Kazenbach*, 824 F.2d 649, 651 (8th Cir.1987). In *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), the Supreme Court set forth the test, for determining whether an Indictment is multiplicitous, as follows:

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

Otherwise stated, offenses are separate if each requires proof of an additional fact that the other does not. This test is based upon the assumption that "Congress ordinarily does not intend to punish the same offense under two different statutes." *Whalen v. United States*, 445 U.S. 684, 692, 100 S.Ct. 1432, 1438, 63 L.Ed.2d 715 (1980). Thus, even if the Counts do not require proof of separate facts, where Congress intended to authorize multiple punishments, the Indictment will not be considered multiplicitous. *Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981).

Although this precise issue has yet to be addressed in this Circuit, other Courts have concluded that the Federal money laundering statute, and its underlying offenses, are not multiplicitous. In *United States v. Smith*, 46 F.3d 1223 (1st Cir.1995), cert. denied, —— U.S. ——, 116 S.Ct. 176, 133 L.Ed.2d 116 (1995), the Court concluded that Counts of money laundering are not multiplicitous with underlying Counts of bank fraud. The Court found that Congress "intended money laundering to be a separate crime distinct from the underlying offense that generated the money." *Id.*, at 1234, quoting *United States v. LeBlanc*, 24 F.3d 340, 346 (1st Cir.1994), cert. denied, —— U.S. ——, 115 S.Ct. 250, 130 L.Ed.2d 172 (1994). Likewise, in *United*

*States v. Edgmon,* 952 F.2d 1206, 1213 (10th Cir.1991), cert. denied, 505 U.S. 1223, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992), the Court concluded that "Congress intended money laundering to be a separate offense from the 'specified illegal activity' that is its predicate offense." The Court reviewed the underlying legislative history and determined that "Congress intended simply to add a new criminal law with respect to the post-crime hiding of the ill-gotten gains." *Id.,* at 1215. See also, *United States v. Skinner,* 946 F.2d 176, 178 (2d Cir.1991) (Congress "intended cumulative punishment under the Money Laundering Act and the Travel Act."); *United States v. Brown,* 31 F.3d 484, 496 n. 20 (7th Cir.1994) (money laundering and bank fraud determined to be separate offenses).

■ We believe that, if faced with the issue, our Court of Appeals would similarly conclude that the money laundering statute, and its underlying offenses, are not sufficiently similar to result in multiplicity. In *United States v. Morris,* 18 F.3d 562, 569 (8th Cir.1994), the Court concluded, for purposes of applying the Sentencing Guidelines provisions that are applicable to money laundering offenses, that "Congress intended cumulative punishment for the specified unlawful activities and the money laundering violations." We believe that such reasoning is wholly consistent with a determination that, under the circumstances here, multiplicity is not at play.

■ Lastly, Pemberton contends that the mail fraud Counts are an insufficient basis for the money laundering charge that is asserted in Count 19. To support this contention, he claims that the mail fraud Counts do not involve the property at issue in the money laundering Count and, further, that the alleged money laundering predated two of the alleged mail fraud transactions.

Notwithstanding these contentions, Pemberton's challenge to the sufficiency of this

Count must fail for, at this juncture, whether the property, that was purportedly involved in the money laundering, had been derived from the asserted mail fraud scheme is a question of fact and, thus, a question we leave for a determination at Trial. See, *United States v. Smith,* 44 F.3d 1259, 1265 (4th Cir.1995) ("To question whether the government, in proving the money laundering charges, establishes the fact that illegal proceeds existed *before* the laundering transaction is a question of proof, not a question of the adequacy of the indictment.") [Emphasis in original], cert. denied, —— U.S. ——, 115 S.Ct. 1970, 131 L.Ed.2d 859 (1995). Since, at this stage of the proceedings, we must accept the allegations of the Indictment as true, we find no basis to dismiss Count 19, and we recommend that Pemberton's Motion be denied.

### 5) *The Motion of Finn and Brown to Dismiss Counts 21 and 22.*

■ All three Defendants are charged in Counts 20 through 22, with "caus[ing] to be placed in the United States Mail" a false sales tax return and the title certifications for two boats, in violation of Title 18 U.S.C. § 1341.[55] Finn moves to dismiss Counts 21 and 22, and Brown joins in the Motion. For dismissal, Finn contends that the alleged mailings were sent after the purported scheme had reached fruition and, therefore, the mailing element of the offense cannot be satisfied.

Counts 20 through 22 assert that a scheme existed to defraud the Band of money and property, and the loyal, honest, and faithful services of each of the Defendants, and to deprive the State of Minnesota of sales tax revenues. In particular, Counts 21 and 22 concern the title certification of two boats. By way of some additional background, on May 6, 1987, Finn purportedly purchased, with funds withdrawn from an RRM, Inc. account, a 1987 20–foot boat. According to

---

**55.** Section 1341 provides, in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises * * * for the purpose of executing such scheme or artifice or attempting so to do,

* * * knowingly causes to be delivered by mail * * * according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both.

**1350**

the Indictment, two weeks later the boat was licensed in the name of Finn's former law firm. On April 19, 1990, Finn purportedly purchased a 1990 21-foot boat, again with funds drawn from an RRM, Inc. account. The Indictment alleges that Finn took possession of this boat in June of 1990, and registered the craft, in his own name, in July of 1990.

As noted, the mailings at issue relate to the two title certifications. Count 21 alleges that, on January 15, 1993, the Defendants "caused to be placed" in the mail, by the Minnesota Department of Natural Resources ("DNR"), a title certificate for the 21-foot boat. Count 22 similarly alleges that, on July 30, 1993, the Defendants caused the DNR to mail a title certificate for the 20-foot boat.

 To prove a violation of the mail fraud statute, the Government must establish that the Defendants devised an intentionally fraudulent scheme, that the Defendants caused to be sent some article through the mails, and that the use of the mails was for the purpose of executing that scheme. *United States v. Taylor*, 789 F.2d 618, 620 (8th Cir.1986). The statute does not reach all frauds, only those "in which the use of the mails is a part of the execution of the fraud." *United States v. Nelson*, 988 F.2d 798, 804 (8th Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 302, 126 L.Ed.2d 250 (1993), quoting *Schmuck v. United States*, 489 U.S. 705, 710, 109 S.Ct. 1443, 1447, 103 L.Ed.2d 734 (1989). However, a mailing need only be "incident to an essential part of the scheme" in order to satisfy the mailing element of the offense. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954).

 With these precepts in mind, we find, in practical effect, that Finn's argument is a challenge to the sufficiency of the Government's proof. In essence, Finn asserts that the Government cannot prove that the use of the mails was in furtherance of any fraudulent scheme, because the mailings occurred after the alleged fraud had come to fruition. However, whether the success of the scheme to defraud the Band was dependent upon the successful passage of title to the boats is a fact-dependent question. See,

*Schmuck v. United States*, supra at 712, 109 S.Ct. at 1448 (rational jury could have found that title registration mailings were part of fraudulent scheme). In any event, it is settled law that a violation of the mail fraud statute can occur after the scheme to defraud has been completed, if the subsequent mailings facilitate a concealment of the crime. In *United States v. Lane*, 474 U.S. 438, 451–52, 106 S.Ct. 725, 733–34, 88 L.Ed.2d 814 (1986), the Supreme Court concluded that mailings were within the prohibitions of the statute if they "were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *Id.*, quoting *United States v. Maze*, 414 U.S. 395, 403, 94 S.Ct. 645, 650, 38 L.Ed.2d 603 (1974). Moreover, whether Finn's acquisition of title prevented or forestalled the detection of the scheme is, again, an issue of fact and, accordingly, is inappropriate for summary resolution.

 Finn further contends that the mail fraud Counts should be dismissed because he did not conceive of the mailings at the time that the boats were purchased. To support this contention, he refers to his waiting three years and six years, respectively, after the purchases of these boats, before he applied for title certificates. Of course, once again, we are confronted by an issue of fact. Even at that, a specific intent to use the mails is not required to sustain a mail fraud charge, for the Government need only establish that the use of the mails was reasonably foreseen. *United States v. Nelson*, supra 805 n. 3. Because we conclude that Finn's Motion to Dismiss Counts 21 and 22 is a challenge to the sufficiency of the Government's proof which, necessarily, eludes a factual resolution at this time, we recommend that the Motion be denied.

*6) The Motion of Pemberton to Dismiss Counts 20 through 22.*

 Pemberton has filed a separate Motion to dismiss Counts 20 to 22, which charge that he "did knowingly cause to be placed in the United States Mail" a false sales tax

return and the title certifications for two boats, in violation of Title 18 U.S.C. § 1957. According to Pemberton, these Counts are constitutionally defective because they fail to indicate any nexus between an action on his part and the alleged fraud. In particular, Pemberton asserts that there is no assertion that he engaged in any act, which related to the purchase of the boats, to the filing of the sales tax return, or to the acquisition of the title certificates.

■ Once again, we read Pemberton's Motion as a challenge, albeit premature, to the sufficiency of the Government's ultimate proof. See, *United States v. Sampson*, supra (Indictment should be tested at the pretrial stage solely by its sufficiency to charge an offense, regardless of the strength or weakness of the Government's case). As a general rule, therefore, an Indictment will be deemed sufficient "unless no reasonable construction can be said to charge the offense." *United States v. Morris*, supra at 568, quoting *United States v. Peterson*, 867 F.2d 1110, 1114 (8th Cir.1989). Here, Pemberton can be held responsible for the substantive crimes that were committed by his co-conspirators, at least to the extent that those offenses were reasonably foreseeable consequences of any acts which furthered the scheme to defraud, even if Pemberton did not, on his own, directly participate in the substantive crimes. *Pinkerton v. United States*, 328 U.S. 640, 645–48, 66 S.Ct. 1180, 1183–85, 90 L.Ed. 1489 (1946). Necessarily, therefore, we conclude that the determination of whether the mailings were in furtherance of the alleged conspiracy is a factual question properly left for the Jury. See, *United States v. Bruno*, 873 F.2d 555, 560 (2nd Cir.1989), cert. denied, 493 U.S. 840, 110 S.Ct. 125, 107 L.Ed.2d 86 (1989) ("Whether a particular substantive crime is foreseeable and in furtherance of the conspiracy is a

factual question to be determined by the jury."). Accordingly, we recommend that Pemberton's Motion to Dismiss Counts 20 through 22 be denied.

### 7) *The Motion of Finn to Dismiss Counts 15 through 19.*

Finn moves to dismiss Counts 15 through 19, each of which alleges that he "did knowingly engage and attempt to engage in a monetary transaction[,] * * * such property having been derived from a specified unlawful activity," in violation of Title 18 U.S.C. § 1957.[56] Finn bases this argument on the notion that, if we dismiss certain predicate offenses, we must then dismiss the Counts which charge him with engaging in money laundering, as those Counts are premised upon offenses that have been charged elsewhere in the Indictment.

A money laundering violation, under Section 1957, is committed whenever a person knowingly engages in a monetary transaction in property that has a value greater than $10,000 and that has been derived from "specified unlawful activity." *Title 18 U.S.C. § 1957(a); United States v. Hare*, 49 F.3d 447, 452 (8th Cir.1995), cert. denied, —— U.S. ——, 116 S.Ct. 211, 133 L.Ed.2d 143 (1995). Section 1957(f)(3) provides that "specified unlawful activity" is defined in Title 18 U.S.C. § 1956(c)(7) which, in turn, defines an "specified unlawful activity" to include money laundering offenses and offenses relating to theft or bribery concerning programs that have received Federal funds.[57] *Title 18 U.S.C. § 1956(c)(7).* According to the Indictment, the "specified unlawful activity" in this case included the alleged mail fraud, as charged in Counts 10 through 14, and the alleged theft from a program receiving Federal funds, as charged in Counts 20 through 22.

---

**56.** Title 18 U.S.C. § 1957 provides:
(a) Whoever * * * knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity shall be punished * * *.

**57.** Section 1956(c)(7), in pertinent part, states:
(7) the term "specified unlawful activity" means—

(A) any act or activity constituting an offense listed in section 1961(1) [which, in turn, defines "racketeering activity" to include "any act which is indictable under section 1341 (relating to mail fraud)"].

* * * * * *

(D) an offense under * * * section 666 (relating to theft or bribery concerning programs receiving Federal funds) * * *.

 As a practical matter, we agree with Finn that, if we were to dismiss Counts 10 through 14 and Counts 20 through 22, then Counts 15 through 19 should be dismissed as well, for there would be no basis upon which to support the money laundering charges. See, *United States v. D'Alessio*, 822 F.Supp. 1134, 1146 (N.J.1993) (Counts charging money laundering violations had to be dismissed after Court dismissed Counts which had served as the "specified unlawful activity").[58] Nevertheless, we have previously concluded that Finn's Motions to Dismiss Counts 10 through 14 and 20 through 22 should be denied. As a consequence, we recommend that his Motion to Dismiss Counts 15 through 19 be denied as well.

NOW, THEREFORE, It is—

ORDERED:

1. That the Government's Motion for Discovery as to Finn, Pemberton, and Brown [Docket No. 56 in 5–95–12(01), Docket No. 56 in 5–95–12(02), and Docket No. 56 in 5–95–12(03) ] is GRANTED.

2. That Finn's and Brown's Motions for Government Agents to Retain Their Rough Notes [Docket No. 40 in 5–95–12(01) and Docket No. 30 in 5–95–12(03) ] are GRANTED.

3. That Finn's and Brown's Motions to Compel the Production of Sentencing Guidelines Information [Docket No. 42 in 5–95–12(01) and Docket No. 111 in 5–95–12(03) ] are DENIED.

4. That Finn's and Brown's Motions for the Disclosure of Jencks Act Materials [Docket No. 44 in 5–95–12(01) and Docket No. 33 in 5–95–12(03) ] are GRANTED.

5. That Finn's and Brown's Motions for the Disclosure of Rule 404(b) Evidence [Docket No. 46 in 5–95–12(01) and Docket No. 35 in 5–95–12(03) ] are GRANTED.

6. That Finn's and Brown's Motions for Discovery and Inspection [Docket No. 48 in 5–95–12(01) and Docket No. 22 in 5–95–12(03) ] are GRANTED; and that Pemberton's and Brown's Motions for the Disclosure of Government Witnesses [Docket No. 65 in 5–95–12(02) and Docket No. 26 in 5–95–12(03) ] are DENIED.

7. That Finn's and Brown's Motions for the Disclosure of Evidence Favorable to the Respective Defendant [Docket No. 50 in 5–95–12(01) and Docket Nos. 23 and 25 in 5–95–12(03) ] are GRANTED.

8. That Finn's Motion for the Disclosure of Post–Conspiracy Statements of Co–Defendants [Docket No. 51 in 5–95–12(01) ] is DENIED.

9. That the Defendants' Motions for a Bill of Particulars [Docket No. 53 in 5–95–12(01), Docket No. 109 in 5–95–12(02), and Docket No. 111 in 5–95–12(03) ] are DENIED.

10. That Finn's and Brown's Motions to Compel the Immediate Disclosure of Expert Witness Summaries [Docket No. 55 in 5–95–12(01) and Docket No. 111 in 5–95–12(03) ] are GRANTED.

11. That Finn's and Brown's Motions for the Disclosure of Grand Jury Instructions, Minutes, and Transcript, or for an *In Camera* Review of the Same, [Docket No. 80 in 5–95–12(01) and Docket No. 111 in 5–95–12(03) ] are DENIED.

12. That Pemberton's and Brown's Motions for Severance and Separate Trials [Docket No. 61 in 5–95–12(02) and Docket No. 36 in 5–95–12(03) ] are DENIED.

13. That Pemberton's Motion to Bifurcate the Forfeiture Proceedings [Docket No. 60 in 5–95–12(02) ] is GRANTED.

---

58. We recognize that the Government need not prove that Finn committed the predicate crimes—here, the mail fraud or the theft from a program receiving Federal funds—from which the property was purportedly derived, but only that the transaction involved the proceeds of a statutorily "specified unlawful activity." See, e.g., *United States v. Smith*, 46 F.3d 1223, 1234 (1st Cir. 1995), cert. denied, — U.S. —, 116 S.Ct. 176, 133 L.Ed.2d 116 (1995), (Section 1957 has no requirement that the Defendant committed the predicate crime). As *Smith* makes clear, however, the Government must establish that the funds were derived from some "specified unlawful activity," and we merely observe that, if the Section 666 and Section 1341 Counts were to be dismissed against each of the Defendants, then there would be no "specified unlawful activity" upon which to base the charge of money laundering.

14. That Pemberton's Motion for Leave to Issue Rule 17(c) Subpoenas Without a Particularized Showing to the Court [Docket No. 72 in 5–95–12(02) ] is DENIED.

15. That Brown's Motion to Affirm or Deny the Government's Use of Electronic Surveillance [Docket No. 31 in 5–95–12(03) ] is DENIED as moot.

AND, It is—

RECOMMENDED:

1. That the Defendants' Motions to Dismiss the Indictment for Want of Subject Matter Jurisdiction [Docket No. 84 in 5–95–12(01), Docket No. 109 in 5–95–12(02), and Docket No. 111 in 5–95–12(03) ] be denied.

2. That the Defendants' Motions to Dismiss and/or Strike all References to Actions to Defraud the State of Minnesota of Sales Tax [Docket No. 81 in 5–95–12(01), Docket No. 109 in 5–95–12(02), and Docket No. 111 in 5–95–12(03) ] be denied.

3. That the Defendants' Motions for the Suppression of Physical Evidence and Statements [Docket No. 83 in 5–95–12(01), Docket Nos. 74 and 109 in 5–95–12(02), and Docket Nos. 28 and 29 in 5–95–12(03) ] be denied.

4. That Finn's and Pemberton's Motions to Dismiss Counts 2 through 9 and 26 [Docket No. 85 in 5–95–12(01) and Docket No. 109 in 5–95–12(02) ] be denied.

5. That Finn's and Pemberton's Motions to Dismiss Counts 10 11, 13 and 14 [Docket No. 87 in 5–95–12(01) and Docket No. 109 in 5–95–12(02) ] be denied.

6. That Finn's and Pemberton's Motions to Dismiss Count 12 [Docket No. 89 in 5–95–12(01) and Docket No. 109 in 5–95–12(02) ] be denied.

7. That Finn's Motion to Dismiss Counts 15 through 19 [Docket No. 90 in 5–95–12(01) ], and Pemberton's Motion to Dismiss Count 19 [Docket No. 75 in 5–95–12(02) ], be denied.

8. That Finn's and Brown's Motions to Dismiss Counts 21 and 22 [Docket No. 91 in 5–95–12(01) and Docket No. 111 in 5–95–12(03) ], and Pemberton's Motion to Dismiss Counts 20 through 22 [Docket No. 77 in 5–95–12(02) ], be denied.

**NOTICE**

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D.Minn. LR1.1(f), and D.Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than October 24, 1995,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than October 24, 1995,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. § 636 to review the transcript in order to resolve all of the objections made.